## MEDELLIN *v.* DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

No. 04–5928.   Argued March 28, 2005—Decided May 23, 2005

*Donald Francis Donovan* argued the cause for petitioner. With him on the briefs were *Carl Micarelli, Catherine M. Amirfar, Thomas J. Bollyky,* and *Gary Taylor.*

*R. Ted Cruz,* Solicitor General of Texas, argued the cause for respondent.   With him on the brief were *Greg Abbott,* Attorney General, *Barry R. McBee,* First Assistant Attorney General, *Don Clemmer,* Deputy Attorney General, and *Sean D. Jordan, Kristofer S. Monson,* and *Adam W. Aston,* Assistant Solicitors General.

*Deputy Solicitor General Dreeben* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Clem-*

*ent, Assistant Attorney General Wray, Irving L. Gornstein,* and *Robert J. Erickson.**

PER CURIAM.

We granted certiorari in this case to consider two questions: first, whether a federal court is bound by the International Court of Justice's (ICJ) ruling that United States

*Briefs of *amici curiae* urging reversal were filed for the American Bar Association by *Robert J. Grey, Jr.,* and *Jeffrey L. Bleich;* for Bar Associations et al. by *Kevin R. Sullivan, William J. Aceves,* and *Clifford S. Anderson;* for Foreign Sovereigns by *Asim M. Bhansali* and *Steven A. Hirsch;* for Former United States Diplomats by *Harold Hongju Koh, Donald B. Ayer,* and *William K. Shirey II;* for the Government of the United Mexican States by *Sandra L. Babcock;* for NAFSA: Association of International Educators et al. by *Stephen F. Hanlon;* and for Ambassador L. Bruce Laingen et al. by *Joseph Margulies.*

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Troy King,* Attorney General of Alabama, and *J. Clayton Crenshaw* and *Charles B. Campbell,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Terry Goddard* of Arizona, *Bill Lockyer* of California, *John W. Suthers* of Colorado, *M. Jane Brady* of Delaware, *Charles J. Crist, Jr.,* of Florida, *Thurbert E. Baker* of Georgia, *Lawrence G. Wasden* of Idaho, *Steve Carter* of Indiana, *Phill Kline* of Kansas, *Jim Hood* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Jim Petro* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Thomas W. Corbett* of Pennsylvania, *Henry D. McMaster* of South Carolina, *Paul G. Summers* of Tennessee, *Mark L. Shurtleff* of Utah, and *Judith Williams Jagdmann* of Virginia; for the Alliance Defense Fund by *Nelson P. Miller, William Wagner,* and *Benjamin Bull;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger;* for the Liberty Legal Institute by *Kelly Shackelford;* for the National District Attorneys' Association by *Charles C. Olson* and *Thomas J. Charron;* for Professors of International Law et al. by *Paul B. Stephan;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* were filed for the European Union et al. by *S. Adele Shank* and *John B. Quigley;* for International Law Experts et al. by *Lori Fisler Damrosch* and *Charles Owen Verrill, Jr.;* for the Mountain States Legal Foundation by *William Perry Pendley;* and for Senator John Cornyn by *Charles J. Cooper, Vincent J. Colatriano,* and *David H. Thompson.*

courts must reconsider petitioner José Medellín's claim for relief under the Vienna Convention on Consular Relations, Apr. 24, 1963, [1970] 21 U. S. T. 77, 100–101, T. I. A. S. No. 6820, without regard to procedural default doctrines; and second, whether a federal court should give effect, as a matter of judicial comity and uniform treaty interpretation, to the ICJ's judgment. 543 U. S. 1032 (2004). After we granted certiorari, Medellín filed an application for a writ of habeas corpus in the Texas Court of Criminal Appeals, relying in part upon a memorandum from President George W. Bush that was issued after we granted certiorari. This state-court proceeding may provide Medellín with the very reconsideration of his Vienna Convention claim that he now seeks in the present proceeding. The merits briefing in this case also has revealed a number of hurdles Medellín must surmount before qualifying for federal habeas relief in this proceeding, based on the resolution of the questions he has presented here. For these reasons we dismiss the writ as improvidently granted. See *Ticor Title Ins. Co.* v. *Brown*, 511 U. S. 117, 121–122 (1994) *(per curiam); The Monrosa* v. *Carbon Black Export, Inc.*, 359 U. S. 180, 183–184 (1959); *Goins* v. *United States*, 306 U. S. 622 (1939).

Medellín, a Mexican national, confessed to participating in the gang rape and murder of two girls in 1993. He was convicted and sentenced to death, and the Texas Court of Criminal Appeals affirmed on direct appeal. Medellín then filed a state habeas corpus action, claiming for the first time that Texas failed to notify him of his right to consular access as required by the Vienna Convention. The state trial court rejected this claim, and the Texas Court of Criminal Appeals summarily affirmed.

Medellín then filed this federal habeas corpus petition, again raising the Vienna Convention claim. The District Court denied the petition. Subsequently, while Medellín's application to the Court of Appeals for the Fifth Circuit for a certificate of appealability was pending, see 28 U. S. C.

§ 2253(c), the ICJ issued its decision in *Case Concerning Avena and other Mexican Nationals (Mex.* v. *U. S.),* 2004 I. C. J. No. 128 (Judgment of Mar. 31), in which the Republic of Mexico had alleged violations of the Vienna Convention with respect to Medellín and other Mexican nationals facing the death penalty in the United States. The ICJ determined that the Vienna Convention guaranteed individually enforceable rights, that the United States had violated those rights, and that the United States must "provide, by means of its own choosing, review and reconsideration of the convictions and sentences of the [affected] Mexican nationals" to determine whether the violations "caused actual prejudice," without allowing procedural default rules to bar such review. *Id.,* ¶¶ 121–122, 153(a).

The Court of Appeals denied Medellín's application for a certificate of appealability. It did so based on Medellín's procedural default, see *Breard* v. *Greene,* 523 U. S. 371, 375 (1998) *(per curiam),* and its prior holdings that the Vienna Convention did not create an individually enforceable right, see, *e. g., United States* v. *Jimenez-Nava,* 243 F. 3d 192, 195 (CA5 2001). 371 F. 3d 270 (CA5 2004). While acknowledging the existence of the ICJ's *Avena* judgment, the court gave no dispositive effect to that judgment.

More than two months after we granted certiorari, and a month before oral argument in this case, President Bush issued a memorandum that stated the United States would discharge its international obligations under the *Avena* judgment by "having State courts give effect to the [ICJ] decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision." George W. Bush, Memorandum for the Attorney General (Feb. 28, 2005), App. 2 to Brief for United States as *Amicus Curiae* 9a. Relying on this memorandum and the *Avena* judgment as separate bases for relief that were not available at the time of his first state habeas corpus action, Medellín filed a successive state application for a writ of habeas corpus

just four days before oral argument here. That state proceeding may provide Medellín with the review and reconsideration of his Vienna Convention claim that the ICJ required, and that Medellín now seeks in this proceeding. This new development, as well as the factors discussed below, leads us to dismiss the writ of certiorari as improvidently granted.[1]

There are several threshold issues that could independently preclude federal habeas relief for Medellín, and thus render advisory or academic our consideration of the questions presented. These issues are not free from doubt.

First, even accepting, *arguendo*, the ICJ's construction of the Vienna Convention's consular access provisions, a violation of those provisions may not be cognizable in a federal habeas proceeding. In *Reed* v. *Farley*, 512 U. S. 339 (1994), this Court recognized that a violation of federal statutory rights ranked among the "nonconstitutional lapses we have held not cognizable in a postconviction proceeding" unless they meet the "fundamental defect" test announced in our decision in *Hill* v. *United States*, 368 U. S. 424, 428 (1962). 512 U. S., at 349 (plurality opinion); see also *id.*, at 355–356 (SCALIA, J., concurring in part and concurring in judgment). In order for Medellín to obtain federal habeas relief, Medellín must therefore establish that *Reed* does not bar his treaty claim.

Second, with respect to any claim the state court "adjudicated on the merits," habeas relief in federal court is available only if such adjudication "was contrary to, or an unreasonable application of, clearly established Federal law, as

---

[1] Of course Medellín, or the State of Texas, can seek certiorari in this Court from the Texas courts' disposition of the state habeas corpus application. In that instance, this Court would in all likelihood have an opportunity to review the Texas courts' treatment of the President's memorandum and *Case Concerning Avena and other Mexican Nationals (Mex. v. U. S.)*, 2004 I. C. J. No. 128 (Judgment of Mar. 31), unencumbered by the issues that arise from the procedural posture of this action.

determined by the Supreme Court." 28 U. S. C. § 2254(d)(1); see *Woodford* v. *Visciotti*, 537 U. S. 19, 22–27 (2002) *(per curiam)*. The state habeas court, which disposed of the case before the ICJ rendered its judgment in *Avena*, arguably "adjudicated on the merits" three claims. It found that the Vienna Convention did not create individual, judicially enforceable rights and that state procedural default rules barred Medellín's consular access claim. Finally, and perhaps most importantly, the state trial court found that Medellín "fail[ed] to show that he was harmed by any lack of notification to the Mexican consulate concerning his arrest for capital murder; [Medellín] was provided with effective legal representation upon [his] request; and [his] constitutional rights were safeguarded." App. to Pet. for Cert. 56a.[2] Medellín would have to overcome the deferential standard with regard to all of these findings before obtaining federal habeas relief on his Vienna Convention claim.[3]

Third, a habeas corpus petitioner generally cannot enforce a "new rule" of law. *Teague* v. *Lane*, 489 U. S. 288 (1989).

---

[2] The Federal District Court reviewing that finding observed:

"Medellín's allegations of prejudice are speculative. The police officers informed Medellín of his right to legal representation before he confessed to involvement in the murders. Medellín waived his right to advisement by an attorney. Medellín does not challenge the voluntary nature of his confession. There is no indication that, if informed of his consular rights, Medellín would not have waived those rights as he did his right to counsel. Medellín fails to establish a 'causal connection between the [Vienna Convention] violation and [his] statements.'" App. to Pet. for Cert. 84a–85a (brackets in original).

[3] In *Breard* v. *Greene*, 523 U. S. 371 (1998) *(per curiam)*, we addressed the claim that Virginia failed to notify a Paraguayan national of his Vienna Convention right to consular access. In denying various writs, motions, and stay applications, we noted that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest"; that Virginia's procedural default doctrine applied to the Vienna Convention claim; and that a successful Vienna Convention claimant likely must demonstrate prejudice. *Id.*, at 375–377. At the time of our *Breard* decision, however, we confronted no final ICJ adjudication.

Before relief could be granted, then, we would be obliged to decide whether or how the *Avena* judgment bears on our ordinary "new rule" jurisprudence.

Fourth, Medellín requires a certificate of appealability in order to pursue the merits of his claim on appeal. 28 U. S. C. § 2253(c)(1). A certificate of appealability may be granted only where there is "a substantial showing of the denial of a *constitutional* right." § 2253(c)(2) (emphasis added). To obtain the necessary certificate of appealability to proceed in the Court of Appeals, Medellín must demonstrate that his allegation of a *treaty* violation could satisfy this standard. See *Slack* v. *McDaniel*, 529 U. S. 473, 483 (2000).

Fifth, Medellín can seek federal habeas relief only on claims that have been exhausted in state court. See 28 U. S. C. §§ 2254(b)(1)(A), (b)(3). To gain relief based on the President's memorandum or ICJ judgments, Medellín would have to show that he exhausted all available state-court remedies.[4]

In light of the possibility that the Texas courts will provide Medellín with the review he seeks pursuant to the *Avena* judgment and the President's memorandum, and the potential for review in this Court once the Texas courts have heard and decided Medellín's pending action, we think it would be unwise to reach and resolve the multiple hin-

---

[4] On March 8, 2005, Medellín filed a successive state habeas action based on Tex. Code Crim. Proc. Ann., Art. 11.071, § 5(a)(1) (Vernon 2005), claiming that both the President's memorandum and the *Avena* judgment independently require the Texas court to grant review and reconsideration of his Vienna Convention claim. See Subsequent Application for Post-Conviction Writ of Habeas Corpus in *Ex Parte Medellín*, Trial Cause Nos. 67,5429 and 67,5430 (Tex. Crim. App.), p. 6 (filed Mar. 24, 2005) ("*First*, the President's determination requires this Court to comply with the *Avena* Judgment and remand Mr. Medellín's case for the mandated review and reconsideration of his Vienna Convention claim. *Second*, the *Avena* Judgment on its own terms provides the rule of decision in Mr. Medellín's case and should be given direct effect by this Court").

drances to dispositive answers to the questions here presented.  Accordingly, we dismiss the writ as improvidently granted.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE SCALIA joins as to Part II, concurring.

Petitioner José Medellín, a Mexican national, was arrested, detained, tried, convicted, and sentenced to death in Texas without being informed of rights accorded him under the Vienna Convention on Consular Relations, Apr. 24, 1963, [1970] 21 U. S. T. 77, 100–101, T. I. A. S. No. 6820.  The Convention called for prompt notice of Medellín's arrest to the Mexican consul.  Medellín could then seek consular advice and assistance.

After unsuccessful challenges to his conviction and sentence, first in state court, later in federal court, Medellín sought this Court's review.  His petition for certiorari, which this Court granted, rests primarily on a judgment rendered by the International Court of Justice (ICJ) on March 31, 2004: *Case Concerning Avena and other Mexican Nationals (Mex. v. U. S.),* 2004 I. C. J. No. 128 *(Avena).*  Medellín's petition also draws support from an ICJ judgment of the same order earlier rendered against the United States: *LaGrand Case (F. R. G. v. U. S.),* 2001 I. C. J. 466 (Judgment of June 27) *(LaGrand).*  The ICJ held in *Avena* that the failure to accord Vienna Convention rights to Medellín and other similarly situated Mexican nationals necessitated review and reconsideration of their convictions and sentences by United States courts.  Further, the ICJ specified, procedural default doctrines could not be invoked to bar the required review and reconsideration.  Medellín sought certiorari on two questions: (1) Are courts in the United States bound by the *Avena* judgment; (2) Should courts in the United States give effect to the *Avena* and *LaGrand* judg-

ments "in the interest of judicial comity and uniform treaty interpretation." Brief for Petitioner i.

On February 28, 2005, President Bush announced:

> "[T]he United States will discharge its international obligations under the decision of the International Court of Justice in *[Avena]*, by having State courts give effect to the decision in accordance with general principles of comity." Memorandum for the Attorney General (Feb. 28, 2005), App. 2 to Brief for United States as *Amicus Curiae* 9a (hereinafter President's Memorandum).

Medellín thereupon moved to stay further proceedings in this Court pending his pursuit of remedies in Texas court, as contemplated by the President's Memorandum. I would grant Medellín's stay motion as the most conservative among courses the Court might take. That "least change" measure, however, has not garnered majority support.

## I

The Court is divided between two responses to Medellín's petition in light of the President's Memorandum: (1) remand to the Court of Appeals for the Fifth Circuit for initial rulings on a host of difficult issues, *post*, at 684, 690 (O'CONNOR, J., dissenting), recognizing that court's prerogative to hold the case in abeyance pending Medellín's pursuit of relief in state court, *post*, at 690; or (2) dismiss the writ, recognizing that "in all likelihood" this Court would be positioned "to review the Texas courts' treatment of the President's [M]emorandum and [the *Avena* judgment] unencumbered by the [threshold] issues that arise from the procedural posture of this action," *ante*, at 664, n. 1. The former course would invite the Fifth Circuit to conduct proceedings rival to those recently launched in state court, or to put the case on hold, a cautionary measure this Court itself is unwilling to take. The latter would leave nothing pending here, but would enable this Court ultimately to resolve, clearly and cleanly, the

controlling effect of the ICJ's *Avena* judgment, shorn of procedural hindrances that pervade the instant action.

## II

For the reasons stated below, I join the Court's election to dismiss the writ as improvidently granted in light of the President's Memorandum and the state-court proceeding instituted in accordance with that Memorandum. I do so recognizing that this Court would have jurisdiction to review the final judgment in the Texas proceedings, and at that time, to rule definitively on "the Nation's obligation under the judgment of the ICJ if that should prove necessary." *Post*, at 691 (SOUTER, J., dissenting).

The principal dissent would return the case to the Fifth Circuit leaving unresolved a bewildering array of questions. See *post*, at 684 (opinion of O'CONNOR, J.) (describing issues not touched by this Court as "difficult"). Among inquiries left open "for further proceedings": Is a certificate of appealability (COA) available when the applicant is not complaining of "the denial of a constitutional right"? *Post*, at 677 (O'CONNOR, J., dissenting) (internal quotation marks omitted); see also *post*, at 677–679; cf. *ante*, at 666. What directions must a lower court take from *Teague* v. *Lane*, 489 U. S. 288 (1989), and perhaps from *Reed* v. *Farley*, 512 U. S. 339 (1994), and *Hill* v. *United States*, 368 U. S. 424 (1962)? *Post*, at 681–682 (O'CONNOR, J., dissenting); cf. *ante*, at 664–666. Is it open to a lower court to resolve the "conflict between *Avena* and [this Court's] decision in *Breard* v. *Greene*, 523 U. S. 371, 376 (1998) *(per curiam)*"? *Post*, at 684 (O'CONNOR, J., dissenting).[1] Has Medellín exhausted state avenues for relief, see *ante*, at 666; *Rhines* v. *Weber*, *ante*, p. 269; *Rose* v. *Lundy*, 455 U. S. 509, 518–520 (1982); cf. *post*, at 682–683, n. 1 (O'CONNOR, J., dissenting), given that the *Avena*

---

[1] See *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484 (1989) (cautioning lower courts against disturbing this Court's decisions). But cf. *post*, at 691–692 (SOUTER, J., dissenting).

judgment and the President's response to it postdate the rejection of Medellín's pleas in Texas proceedings? While contentious preliminary issues clog final determination of Medellín's claim for federal habeas relief based on the ICJ's judgments, action by the Texas courts could render the entire array of questions moot. See *post*, at 692 (SOUTER, J., dissenting) ("[A]ction in the Texas courts might remove any occasion to proceed under the federal habeas petition.").

Further, at odds with the President's determination to "give effect to the *[Avena]* decision in accordance with general principles of comity," President's Memorandum, and in conspicuous conflict with the law of judgments, see Restatement (Second) of Conflict of Laws § 98 (1988); Restatement (Third) of Foreign Relations Law of the United States § 481 (1986); Restatement (Second) of Judgments § 17 (1980), the principal dissent would instruct the Court of Appeals to "hol[d] up the *Avena* interpretation of the [Vienna Convention] against the domestic court's own conclusions." *Post*, at 684 (opinion of O'CONNOR, J.). But cf. ALI, Recognition and Enforcement of Foreign Judgments: Analysis and Proposed Federal Statute § 2, Comment *d*, p. 38 (2005) ("[A] judgment entitled to recognition will not be reexamined on the merits by a second court."). It is the long-recognized general rule that, when a judgment binds or is respected as a matter of comity, a "let's see if we agree" approach is out of order. See *Hilton* v. *Guyot*, 159 U.S. 113, 202–203 (1895) (where "comity of this nation" calls for recognition of a judgment rendered abroad, "the merits of the case should not . . . be tried afresh . . . upon the mere assertion . . . that the judgment was erroneous in law or in fact"); see also Restatement (Second) of Conflict of Laws § 106 (1969) ("A judgment will be recognized and enforced in other states even though an error of fact or of law was made in the proceedings before judgment . . . ."); *id.*, § 106, Comment *a* ("Th[is] rule is . . . applicable to judgments rendered in foreign nations . . . ."); Reese, The Status in This Country of Judgments Rendered

Abroad, 50 Colum. L. Rev. 783, 789 (1950) ("[Foreign] judgments will not be denied effect merely because the original court made an error either of fact or of law.").[2]

Troubling as well, the principal dissent provides no clear instructions to the Court of Appeals on which of the several questions the dissenters would remit to that court comes first, which others "should be part of" the COA determination, *post*, at 682 (opinion of O'CONNOR, J.), and which are meet for adjudication only if, as, or when a COA is granted. The participation of a federal court in the fray at this point, moreover, risks disturbance of, or collision with, the proceeding Medellín has commenced in Texas. The principal dissent appears ultimately to acknowledge that concern by observing that the Fifth Circuit might "hold the case on its docket until Medellín's successive petition was resolved in state court." *Post*, at 690 (opinion of O'CONNOR, J.); see also

---

[2] The principal dissent maintains that the second question on which we granted certiorari asks "whether and what weight [short of binding effect] American courts should give to *Avena*," in the course of independently interpreting the treaty, "perhaps for sake of uniform treaty interpretation." *Post*, at 684 (opinion of O'CONNOR, J.); see *post*, at 684–685, and n. 2 (same). Significantly, Medellín chose not to break out for discrete review in this Court questions underlying and subsumed in the ICJ's judgments in *Avena*, 2004 I. C. J. No. 128 (Judgment of Mar. 31), and *LaGrand*, 2001 I. C. J. 466 (Judgment of June 27), *i. e.*, whether the Vienna Convention "creates a judicially enforceable individual right" and whether it "sometimes requires state procedural default rules to be set aside so that the treaty can be given 'full effect,'" *post*, at 673 (O'CONNOR, J., dissenting). Nor does Medellín's invocation of "international comity," Brief for Petitioner 45, or his plea for "uniform treaty interpretation," *id.*, at 48, seek this Court's independent interpretation of the Convention. Instead, he urges that comity is accorded, and uniformity achieved, by recognizing as authoritative the ICJ's interpretation as elaborated in successive judgments against the United States. See *id.*, at 49 ("Given its consent to the ICJ's jurisdiction, the United States should treat as authoritative *any* interpretation or application of the Convention by that court."); see also Reply Brief 16 (observing that the United States "agreed that the ICJ would have *final* authority to resolve disputes over the treaty's interpretation and application" (emphasis added)).

*post,* at 692 (SOUTER, J., dissenting); *post,* at 694 (BREYER, J., dissenting). But given this Court's unwillingness to put the case on hold here, one might ask what justifies parking the case, instead, in the Court of Appeals.

The *per curiam* opinion which I join rests on two complementary grounds. First, the Texas proceeding "may provide Medellín with the very reconsideration of his Vienna Convention claim that he now seeks in the present proceeding." *Ante,* at 662. Second, the instant proceeding comes to us freighted with formidable threshold issues, *ante,* at 664–666, that deter definitive answers to the questions presented in the petition for certiorari.

Petitioner's recent filing in the Texas Court of Criminal Appeals raises two discrete bases for relief that were not previously available for presentation to a state forum: the ICJ's *Avena* judgment and the President's Memorandum. See Subsequent Application for Post-Conviction Writ of Habeas Corpus in *Ex Parte Medellín,* Trial Cause Nos. 67,5429 and 67,5430 (Tex. Crim. App.), p. 13 (filed Mar. 24, 2005) ("President Bush's determination and the *Avena* Judgment constitute two separate sources of binding federal law."). The Texas courts are now positioned immediately to adjudicate these cleanly presented issues in the first instance. In turn, it will be this Court's responsibility, at the proper time and if need be, to provide the ultimate answers.

JUSTICE O'CONNOR, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

José Ernesto Medellín offered proof to the Court of Appeals that reasonable jurists would find debatable or wrong the District Court's disposition of his claim that Texas violated his rights under the Vienna Convention on Consular Relations and that he is thereby entitled to review and reconsideration of his conviction and sentence. Three specific issues deserve further consideration: (1) whether the International Court of Justice's judgment in Medellín's favor, *Case*

*Concerning Avena and Other Mexican Nationals (Mex.* v. *U. S.),* 2004 I. C. J. No. 128 (Judgment of Mar. 31), is binding on American courts; (2) whether Article 36(1)(b) of the Convention creates a judicially enforceable individual right; and (3) whether Article 36(2) of the Convention sometimes requires state procedural default rules to be set aside so that the treaty can be given "full effect." Accordingly, I would vacate the denial of a certificate of appealability and remand for resolution of these issues.

The Court dismisses the writ (and terminates federal proceedings) on the basis of speculation: Medellín *might* obtain relief in new state court proceedings—because of the President's recent memorandum about whose constitutionality the Court remains rightfully agnostic, or he *might* be unable to secure ultimate relief in federal court—because of questions about whose resolution the Court is likewise, rightfully, undecided. These tentative predictions are not, in my view, reason enough to avoid questions that are as compelling now as they were when we granted a writ of certiorari, and that remain properly before this Court. It seems to me unsound to avoid questions of national importance when they are bound to recur. I respectfully dissent.

## I

Article 36 of the Vienna Convention on Consular Relations guarantees open channels of communication between detained foreign nationals and their consulates in signatory countries:

"[I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authori-

ties without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph." Vienna Convention on Consular Relations, Art. 36(1)(b), Apr. 24, 1963, [1970] 21 U. S. T. 77, 101, T. I. A. S. No. 6820.

Presently 167 nations are party to the Vienna Convention, including our immediate neighbors to the north and south. Multilateral Treaties Deposited with the Secretary-General United Nations, N. Y., http://untreaty.un.org/English/bible/englishinternetbible/partI/chapterIII/treaty31.asp (all Internet materials as visited May 19, 2005, and available in Clerk of Court's case file).

In this country, the individual States' (often confessed) noncompliance with the treaty has been a vexing problem. See, e. g., United States v. Emuegbunam, 268 F. 3d 377, 391 (CA6 2001) (discussing cases about Vienna Convention violations). It has three times been the subject of proceedings in the International Court of Justice (ICJ). See Case Concerning Vienna Convention on Consular Relations (Para. v. U. S.), 1998 I. C. J. 426 (Order of Nov. 10); LaGrand Case (F. R. G. v. U. S.), 2001 I. C. J. 466 (Judgment of June 27); Avena, supra. The problem may have considerable ramifications, because foreign nationals are regularly subject to state criminal justice systems. For example, in 2003, over 56,000 noncitizens were held in state prisons. Noncitizens accounted for over 10% of the prison populations in California, New York, and Arizona. U. S. Dept. of Justice, Bureau of Justice Statistics Bull., p. 5 (rev. July 14, 2004), Prison and Jail Inmates at Midyear 2003, http://www.ojp.usdoj.gov/bjs/pub/pdf/pjim03.pdf.

Noncompliance with our treaty obligations is especially worrisome in capital cases. As of February 2005, 119 noncitizens from 31 nations were on state death row. Foreign Nationals and the Death Penalty in the United States, Reported Foreign Nationals Under Sentence of Death in the U. S., http://www.deathpenaltyinfo.org/article.php?did=198&

scid=31. In *Avena,* the ICJ determined that the United States had breached its obligation to inform 51 Mexican nationals, all sentenced to death in this country, of their right to consular notification. Medellín is just one of them. 2004 I. C. J. No. 128, ¶ 106. His case thus presents, and the Court in turn avoids, questions that will inevitably recur.

José Ernesto Medellín told the officers who arrested him in Texas that he was born in Laredo, Mexico. App. JA15. He also told the Harris County Pretrial Services that he is not an American citizen. App. to Pet. for Cert. 165a. Nonetheless, Medellín was arrested, detained, tried, convicted, and sentenced to death without ever being informed that he could contact the Mexican consul. Mexican consular authorities only became aware of Medellín's predicament some six weeks after his conviction was affirmed, when he wrote them a letter from Texas' death row. Since coming into contact with his consul, Medellín has maintained that Texas authorities violated his rights under the Convention and has sought (among other relief) an evidentiary hearing to determine whether he was prejudiced by the violation.

First, Medellín filed a state application for a writ of habeas corpus. The Texas trial court denied relief, reasoning in relevant part:

> "13. Based on the applicant's lack of objection at trial to the alleged failure to inform him of his rights under the Vienna Convention, the applicant is procedurally barred from presenting his habeas claim that the alleged violation of the Vienna Convention violated his constitutional rights. *Hodge* v. *State,* 631 S. W. 2d 754, 757 (Tex. Crim. App. 1982); *Williams* v. *State,* 549 S. W. 2d 183, 187 (Tex. Crim. App. 1977).

> .    .    .    .    .    .

> "15. In the alternative, the applicant, as a private individual, lacks standing to enforce the provisions of the Vienna Convention. *Hinojosa* v. *State,* No. 72,932 (Tex. Crim. App. Oct. 27, 1999) (holding that treaties operate

as contracts among nations; thus, offended nation, not individual, must seek redress for violation of sovereign interests)." *Id.*, at 55a–56a.

The Texas Court of Criminal Appeals affirmed.

Medellín next petitioned for habeas relief in the United States District Court for the Southern District of Texas. While that petition was pending, the ICJ announced its interpretation of Article 36 in a case that Germany had brought against the United States after Arizona failed to advise two German capital defendants about consular notification. *LaGrand, supra.* Consistent with Medellín's own arguments about the Convention's meaning, the ICJ decided in *LaGrand* that the treaty confers individual rights and requires that state procedural default rules sometimes give way when foreign national defendants raise Vienna Convention claims. See *id.*, at 490–491, 497–498. Medellín argued to the District Court that the ICJ's interpretation of Article 36 was definitive, persuasive, and should control the resolution of his claim. Rejecting these and other arguments, the District Court denied relief.

Medellín then sought to obtain a certificate of appealability (COA) from the United States Court of Appeals for the Fifth Circuit. See 28 U. S. C. § 2253(c). A COA may issue only if the applicant has demonstrated that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner [in the district court] or that the issues presented were '"adequate to deserve encouragement to proceed further."'" *Slack* v. *McDaniel*, 529 U. S. 473, 484 (2000) (quoting *Barefoot* v. *Estelle*, 463 U. S. 880, 893, n. 4 (1983)).

Meanwhile, Mexico had initiated proceedings in the ICJ against the United States on grounds that 54 Mexican capital defendants, including Medellín, had been denied their Vienna Convention rights. See *Avena, supra.* The ICJ's decision in *Avena* issued while Medellín's application for a COA was pending. Repeating the construction it had given to Article

36 in *LaGrand*, the ICJ decided that Medellín and 50 others were entitled to review and reconsideration of their convictions and sentences because the United States, through various individual States, had violated their Vienna Convention rights. *Avena, supra*, ¶ 153. The Court of Appeals noted the ICJ's pronouncements in *LaGrand* and *Avena*, and nonetheless concluded that Medellín's treaty claim lacked the requisite merit for a COA.

We granted certiorari on two questions. First, does *Avena* have preclusive effect in our courts? Second, if our courts are not bound to apply *Avena* as a rule of decision, must they give the ICJ's decision effect for sake of uniform treaty interpretation or comity? These questions refer to substantial, debatable issues in Medellín's Vienna Convention claim. I would therefore vacate the denial of a COA and remand for further proceedings.

## II

### A

At every step, the federal courts must evaluate Medellín's Vienna Convention claim through the framework of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which controls the process by which a state prisoner may obtain federal habeas relief. And wherever the Convention, which has been in continuous force since 1969, conflicts with this subsequently enacted statute, the statute must govern. *Reid* v. *Covert*, 354 U. S. 1, 18 (1957) (plurality opinion); see also *Whitney* v. *Robertson*, 124 U. S. 190, 194 (1888).

At the outset, Texas and the United States argue that AEDPA, 28 U. S. C. § 2253(c), precludes ruling for Medellín no matter how meritorious his Vienna Convention claim may be. According to § 2253(c)(2), a COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." Texas maintains that prisoners may only appeal district courts' adverse decisions involving constitutional rights—that Congress did not use the word "con-

stitutional" in the statute as shorthand for all of the federal claims traditionally heard in habeas. But see 1 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure 448–449 (4th ed. 2001). See also *Slack, supra,* at 483 (noting Congress' substitution of " 'constitutional' " for " 'federal' " in the standard for obtaining a certificate of probable cause— the COA's predecessor—without saying if the change is meaningful).

Texas concedes that it raised this objection for the first time in its merits brief to this Court. Tr. of Oral Arg. 29. Normally this Court will not decide a question raised at this stage. See *Taylor* v. *Freeland & Kronz,* 503 U. S. 638, 645–646 (1992). But Texas contends that this is a nonwaivable jurisdictional objection. So we must start with the question of whether it actually is an objection that cannot be waived. It is true that the COA is jurisdictional in the sense that it is a "gateway" device. *Miller-El* v. *Cockrell,* 537 U. S. 322, 337 (2003). By obliging applicants to make a threshold showing before their cases are aired out on appeal, the COA serves an important screening function and conserves the resources of appellate courts. To that end, the existence of a COA is jurisdictional insofar as a prisoner cannot appeal in habeas without one. See *id.,* at 335–336. Accordingly, a federal court must verify that a COA has issued before hearing the merits of a habeas appeal.

It does not follow, however, that courts must raise and decide predicate arguments about the validity of a COA independently, without prompting from the parties, even when ordinary waiver rules would apply, as they must with true jurisdictional arguments. If that were so, an appellate court, presiding over an appeal after the district court had issued a COA, would always be required to check that a "substantial showing" had been made and a cognizable right asserted—even in the absence of controversy between the parties. We have never imposed such a rule, and it would undermine the efficiency of the COA process. Cf. *Young* v.

*United States,* 124 F. 3d 794, 799 (CA7 1997). Predicate considerations for a COA—whether a "substantial showing" has been made or a "constitutional right" asserted—are not the sorts of considerations that remain open for review throughout the entire case. Compare *Peguero* v. *United States,* 526 U. S. 23 (1999) (considering whether a violation of Federal Rule of Criminal Procedure 32(a)(2) provided a basis for collateral relief), with Brief for United States in *Peguero* v. *United States,* O. T. 1998, No. 97–9217, p. 6, n. 5 (arguing that § 2253(c) deprived the Court of jurisdiction because a constitutional right was not at stake). Thus, because Texas did not argue below that a treaty-based claim cannot support an application for a COA, it cannot raise the argument now.

Texas also adverts to another AEDPA provision, 28 U. S. C. § 2254(d), which it says is fatal to Medellín's treaty claim. The statute provides that a writ of habeas corpus shall not issue on behalf of a person in state custody with respect to any claim "adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Whether Medellín's claim clears these hurdles is an appropriate consideration for an appellate court contemplating whether to grant a COA, and for this Court reviewing the denial of a COA. See *Miller-El,* 537 U. S., at 349–350 (SCALIA, J., concurring) ("A circuit justice or judge must deny a COA . . . if all reasonable jurists would conclude that a substantive provision of the federal habeas statute bars relief"); see also *id.,* at 336 (majority opinion).

The Texas court's disposition of Medellín's Vienna Convention claim is not entitled to deference under § 2254(d), and thus should not constrain a final decision in federal court about whether he deserves habeas relief. The Texas court gave two reasons for dismissing the claim. First, it applied its procedural default rule to Medellín's assertion of right

under the Vienna Convention. See *supra,* at 675. In so doing, it did not adjudicate the merits of the relevant federal question—whether, under Article 36(2), the treaty overrides state procedural default rules. Second, the Texas court appears to have reasoned that private individuals (as opposed to offended nations) can never enforce any treaty in court. See *supra,* at 675–676. This reasoning is "contrary to" our precedents and, therefore, is not entitled to deference in subsequent federal proceedings. "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams* v. *Taylor,* 529 U. S. 362, 405 (2000); see also *Brown* v. *Payton, ante,* at 141. The Texas court's blanket rule plainly contradicts our governing law, for it is axiomatic that, while treaties are compacts between nations, "a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country." *Head Money Cases,* 112 U. S. 580, 598 (1884). The Texas court neither asked nor answered the right question: whether an individual can bring a claim under *this* particular treaty. Accordingly, any consideration of Medellín's Vienna Convention claim for habeas relief in federal court—including his assertion that *Avena* provides a binding rule of decision—must proceed *de novo.* See *Williams, supra,* at 406.

## B

The Court catalogs a number of other, nonjurisdictional questions that, in its view, justify dismissing the case because they could preclude ultimate habeas relief for Medellín. *Ante,* at 664–666. Apparently the Court agrees that it would be impossible or imprudent to decide these questions today. It seems odd to me to leave them undecided and yet to rely on them as reason to avoid the weighty questions that

*are* undeniably properly before us. Given the posture of this case, our modest task is to decide only whether Medellín has presented claims worthy of a COA, and the majority points to issues outside the scope of that inquiry. Anyway, it is not our practice generally, when remanding a case to the lower courts after resolving discrete questions, to canvass all of the possible permutations of what could happen before a final resolution. Thus, while the Court points to questions that are, of course, important, none ought to detain us here.

First, Texas and the United States have made no mention of *Reed* v. *Farley*, 512 U. S. 339 (1994), and *Hill* v. *United States*, 368 U. S. 424 (1962), depriving Medellín of an opportunity to discuss their applicability to his case—a complicated question. Second, while Texas did argue in its certiorari papers that Medellín had already received a prejudice analysis in state habeas, see Brief in Opposition 14–16, it abandoned this argument in its brief on the merits. See *United States* v. *International Business Machines Corp.*, 517 U. S. 843, 855, n. 3 (1996) (the Court does not address abandoned arguments). Here, Texas argues that Medellín cannot show prejudice in a *future* proceeding, not that he has already failed to show prejudice or that the state court thought (not unreasonably) that the Vienna Convention had been satisfied by its prejudice analysis. See Brief for Respondent 16–17. Moreover, Medellín has maintained an unfulfilled request for an evidentiary hearing about prejudice. The ICJ, for its part, appears to believe that Medellín has yet to receive the prejudice analysis that the Vienna Convention requires; otherwise, it would not have ruled—after the state habeas proceedings had concluded—that the United States must still provide "review and reconsideration" of his sentence to determine if he suffered "actual prejudice." *Avena*, 2004 I. C. J. No. 128, ¶¶ 121–122, 153. Third, the Court is correct to observe that, before obtaining relief, Medellín would have to contend with *Teague* v. *Lane*, 489 U. S. 288 (1989). The Court of Appeals never discussed *Teague*'s applicability to

Medellín's case. Whether *Teague* bars relief for Medellín is itself a highly debatable question that should be part of a proper COA analysis upon remand.

## III

"While a COA ruling is not the occasion for a ruling on the merit of petitioner's claim," *Miller-El*, 537 U. S., at 331, some assessment of Medellín's arguments is necessary to explain why the COA's denial should be vacated.

### A

The Optional Protocol to the Vienna Convention provides that "[d]isputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice." Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, Art. I, [1970] 21 U. S. T. 326, T. I. A. S. No. 6820 (hereinafter Optional Protocol). The United States was party to the Optional Protocol until recently. See Letter from Condoleezza Rice, Secretary of State, to Kofi A. Annan, Secretary-General of the United Nations (Mar. 7, 2005) (notifying the Secretary-General that the United States hereby withdraws from the Optional Protocol). And the ICJ decided *LaGrand* and *Avena* pursuant to the Optional Protocol's grant of authority. The first question on which we granted certiorari asks whether American courts are now bound to follow the ICJ's decision in *Avena* when deciding Vienna Convention claims.[1]

---

[1] The Court suggests that Medellín's reliance on *Avena* may be a distinct claim, and that he may not have properly exhausted it in state court. *Ante,* at 666. But Medellín has maintained a single claim throughout the state and federal habeas proceedings—that Texas violated his rights under the Vienna Convention and that he is entitled to a remedy for that violation. Pointing to *Avena* as a rule of decision for the adjudication of that claim is akin to pointing to a new decision from this Court to bolster

If Medellín is right to say that they must, then the District Court's resolution of his Vienna Convention claim is not merely debatable, but wrong in result and in reasoning. In terms of result, the ICJ made clear that it would be improper to dismiss Medellín's claim, for once the United States had committed "internationally wrongful acts," the necessary "remedy to make good these violations should consist in an obligation on the United States to permit review and reconsideration of [the 51 Mexican] nationals' cases by the United States courts." *Avena*, 2004 I. C. J. No. 128, ¶ 121. The ICJ's reasoning is also irreconcilable with the District Court's. The ICJ specified that the Convention confers rights on individual defendants, and that applying state procedural default rules to prevent them from vindicating their rights violates the treaty, for the treaty requires that its purposes be given " 'full effect.' " *Id.,* ¶¶ 106, 113.

Medellín argues that once the United States undertakes a substantive obligation (as it did in the Vienna Convention), and at the same time undertakes to abide by the result of a specified dispute resolution process (as it did by submitting to the ICJ's jurisdiction through the Optional Protocol), it is bound by the rules generated by that process no less than it is by the treaty that is the source of the substantive obligation. In other words, because *Avena* was decided on the back of a self-executing treaty, see *infra*, at 686, it must be given effect in our domestic legal system just as the treaty itself must be. Medellín asserts, at bottom, that *Avena*, like a treaty, has the status of supreme law of the land.

On the other hand, Texas and the United States argue that the issue turns in large part on how to interpret Article 94(1) of the United Nations Charter, which provides that "[e]ach Member of the United Nations undertakes to comply with

---

an existent claim for relief. In neither case has petitioner made a new claim as opposed to a new argument supporting his pending claim. Cf. *Yee* v. *Escondido,* 503 U. S. 519, 534–535 (1992).

the decision of the International Court of Justice in any case to which it is a party." 59 Stat. 1051. They maintain that the charter imposes an international duty only on our political branches. A contrary result could deprive the Executive of necessary discretion in foreign relations, and may improperly displace this Court's responsibilities to an international body. For his part, Medellín says that Article 94(1) cannot answer the question of whether, under domestic law and the Supremacy Clause, our courts are bound to comply with the international obligation reflected in *Avena*.

The Court of Appeals passed on whether it was bound by *Avena*, and decided that the issue was not worthy of a COA. In so doing, it noted some conflict between *Avena* and our decision in *Breard* v. *Greene*, 523 U. S. 371, 376 (1998) *(per curiam)*. How to resolve that conflict is a difficult question. Reasonable jurists can vigorously disagree about whether and what legal effect ICJ decisions have in our domestic courts, and about whether Medellín can benefit from such effect in this posture. The Court of Appeals should have granted a COA and given the issue further consideration.

## B

We also granted certiorari on a second, alternative question that asks whether and what weight American courts should give to *Avena*, perhaps for sake of uniform treaty interpretation, even if they are not bound to follow the ICJ's decision. That question can only be answered by holding up the *Avena* interpretation of the treaty against the domestic court's own conclusions, and then deciding how and to what extent the two should be reconciled. See *Olympic Airways* v. *Husain*, 540 U. S. 644, 660–661 (2004) (SCALIA, J., dissenting); *Air France* v. *Saks*, 470 U. S. 392, 404 (1985). Accordingly, the second question presented encompassed two other issues, both pressed and passed upon below, that are themselves debatable and thus grounds for a COA: whether the

Vienna Convention creates judicially enforceable rights and whether it sometimes trumps state procedural default rules.[2]

This Court has remarked that Article 36 of the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest." *Breard, supra,* at 376. The United States maintains, on the contrary, that Article 36 does not give foreign nationals a judicially enforceable right to consular access. On that theory, a detained foreign national may *never* complain in court—even in the course of a trial or on direct review—about a State's failure to "inform the person concerned without delay of his rights under" Article 36. 21 U. S. T., at 101. The complainant must be the sending state, and any remedy is political, diplomatic, or between the states in international law.

When called upon to interpret a treaty in a given case or controversy, we give considerable weight to the Executive Branch's understanding of our treaty obligations. See *Kolovrat* v. *Oregon,* 366 U. S. 187, 194 (1961); *Charlton* v. *Kelly,* 229 U. S. 447, 468 (1913). But a treaty's meaning is not be-

---

[2] JUSTICE GINSBURG gives an unduly narrow construction to the second question presented. It asks: "[S]hould a court in the United States give effect to the judgments in *Avena* and *LaGrand*"? Brief for Petitioner i. This question cannot be read to ask for "'effect'" to be given in the strict sense of the law of judgments, *ante,* at 670–671 (GINSBURG, J., concurring): Because Medellín was not a beneficiary of the judgment in *LaGrand Case (F. R. G.* v. *U. S.),* 2001 I. C. J. 466 (Judgment of June 27), a case between Germany and the United States, the judgment in *LaGrand* cannot be enforced as to Medellín. What he asks is that American courts reach the same interpretation of the Vienna Convention as did the body charged with adjudicating international disputes arising out of the Convention—in part for the sake of "uniform treaty interpretation." Brief for Petitioner i. This understanding of the second question takes account, as it should, of the fact that the correct, independent interpretation of the Vienna Convention was the central question in the habeas proceedings below. Moreover, it is consistent with the practical way we decide what is "fairly included" in a question presented. See this Court's Rule 14.1(a); *City of Sherrill* v. *Oneida Indian Nation of N. Y., ante,* at 213, n. 6; *Ballard* v. *Commissioner, ante,* at 47, n. 2.

yond debate once the Executive has interpreted it. Cf., *e. g.*, *Chan* v. *Korean Air Lines, Ltd.*, 490 U. S. 122, 136 (1989) (Brennan, J., concurring in judgment) (observing that the Court was rejecting a view of the Warsaw Convention that had consistently been adopted by the Executive Branch and had been pressed by the United States in that case); *Perkins* v. *Elg*, 307 U. S. 325, 328, 337–342 (1939) (declining to adopt Executive's treaty interpretation); *Johnson* v. *Browne*, 205 U. S. 309, 319–321 (1907) (same); *De Lima* v. *Bidwell*, 182 U. S. 1, 181, 194–199 (1901) (same).

Article 36 of the Vienna Convention on Consular Relations is, as the United States recognizes, a self-executing treaty. Brief for United States as *Amicus Curiae* 26. Chief Justice Marshall explained that a self-executing treaty is domestic law. It "operates of itself," as "a rule for the Court," "equivalent to an act of the legislature." *Foster* v. *Neilson*, 2 Pet. 253, 314 (1829). Because the Convention is self-executing, then, its guarantees are susceptible to judicial enforcement just as the provisions of a statute would be. See *Head Money Cases*, 112 U. S., at 598–599 ("A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute"); see generally L. Henkin, Foreign Affairs and the United States Constitution 206–209 (2d ed. 1996).

To ascertain whether Article 36 confers a right on individuals, we first look to the treaty's text as we would with a statute's. *United States* v. *Alvarez-Machain*, 504 U. S. 655, 663 (1992); *Air France, supra*, at 397. Article 36(1)(b) entails three different obligations for signatory host countries. Their competent authorities shall (1) inform the consul of its nationals' detentions, (2) forward communication from a detained national to his consulate, and (3) "inform the person

concerned without delay of *his rights under this sub-paragraph.*" 21 U. S. T., at 101 (emphasis added). Of these, the third exclusively concerns the detained individual, and it is the only obligation expressed in the language of rights. If Article 36(1) conferred no rights on the detained individual, its command to "inform" the detainee of "his rights" might be meaningless. Other provisions in the treaty appear to refer back to individual rights. See Art. 36(1)(a), *ibid.*; Art. 36(2), *ibid.*

To be sure, the questions of whether a treaty is self-executing and whether it creates private rights and remedies are analytically distinct. If Article 36(1)(b) imposed only two obligations on signatory countries—to notify the consul and forward correspondence—then Medellín could not invoke the treaty as a source of personal rights by virtue of its self-executing character. But the treaty goes further—imposing an obligation to inform the individual of his rights in the treaty. And if a statute were to provide, for example, that arresting authorities "shall inform a detained person without delay of his right to counsel," I question whether more would be required before a defendant could invoke that statute to complain in court if he had not been so informed.

This Court has repeatedly enforced treaty-based rights of individual foreigners, allowing them to assert claims arising from various treaties. These treaties, often regarding reciprocity in commerce and navigation, do not share any special magic words. Their rights-conferring language is arguably no clearer than the Vienna Convention's is, and they do not specify judicial enforcement. See, *e. g., Asakura* v. *Seattle,* 265 U. S. 332, 340 (1924) (allowing Japanese national to bring a claim under a United States-Japan treaty requiring that "'citizens or subjects of each of the [two countries] shall have liberty . . . to carry on trade'" in the other's territory, and holding that a local licensing ordinance for pawnbrokers could not be applied to the Japanese petitioner without violating the treaty's guarantee); *Kolovrat, supra,* at 191–192,

and n. 6 (sustaining Yugoslavians' claim against enforcement of Oregon inheritance law limiting their right to inherit, when United States-Serbia Treaty promised that "'[i]n all that concerns the right of acquiring, possessing or disposing of every kind of property . . . citizens of [each country in the other] shall enjoy the rights which the respective laws grant in each of these states to the subjects of the most favored nation'").

Likewise, the United States acknowledges with approval that other provisions of the Vienna Convention, which relate to consular privileges and immunities, have been the source of judicially enforced individual rights. See Brief for United States as *Amicus Curiae* 26, n. 7 (citing *Risk* v. *Halvorsen*, 936 F. 2d 393, 397 (CA9 1991) (deciding whether Article 43 of the Vienna Convention defeated jurisdiction under 28 U. S. C. § 1351 over defendant consular officials), and *Gerritsen* v. *de la Madrid Hurtado*, 819 F. 2d 1511, 1515–1516 (CA9 1987) (same)). Although Article 43 is phrased in terms of courts' jurisdiction, its violations could theoretically also be vindicated exclusively in political and diplomatic processes, but have not been. See Art. 43(1), 21 U. S. T., at 104 ("Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions"); see also *Kolovrat*, 366 U. S., at 193; *Hauenstein* v. *Lynham*, 100 U. S. 483, 487 (1880).

There are plausible arguments for the Government's construction of Article 36. See generally *Choctaw Nation* v. *United States*, 318 U. S. 423, 431–432 (1943) (looking to extrinsic sources for treaty interpretation). The preamble to the Vienna Convention, for example, states that "the purpose of such privileges and immunities [contained in the treaty] is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." 21 U. S. T., at 79. Moreover, State Depart-

ment and congressional statements contemporaneous with the treaty's ratification say or indicate that the Convention would not require significant departures from existing practice. See *United States* v. *Li*, 206 F. 3d 56, 64–65 (CA1 2000); but see *id.*, at 73–75 (Torruella, C. J., concurring in part and dissenting in part). The United States interprets such statements to mean that the political branches did not contemplate a role for the treaty in ordinary criminal proceedings. See Brief for United States as *Amicus Curiae* 21–22. The Government also asserts that the State Department's previous litigation behavior in Article 36 cases is consistent with the Executive's treaty interpretation presented here. *Id.*, at 22–23; see also *Li, supra,* at 64. I would allow fuller consideration of this issue upon the granting of a COA.

Of course, even if the Convention does confer individual rights, there remains the question of whether such rights can be forfeited according to state procedural default rules. Article 36(2) of the treaty provides: "The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." 21 U. S. T., at 101. Medellín contends that this provision requires that state procedural default rules sometimes be set aside so that the treaty can be given "full effect." *Ibid.* In *Breard,* in the course of denying a stay of imminent execution and accompanying petitions, we concluded that the petitioner had defaulted his Article 36 claim by failing to raise it in state court prior to seeking collateral relief in federal court. 523 U. S., at 375–376. Subsequently in *Avena,* as explained above, the ICJ interpreted Article 36(2) differently. 2004 I. C. J. No. 128, ¶¶ 112–113. In the past the Court has revisited its interpretation of a treaty when new international law has come to light. See *United States* v. *Percheman,* 7 Pet. 51, 89 (1833). Even if *Avena* is not

itself a binding rule of decision in this case, it may at least be occasion to return to the question of Article 36(2)'s implications for procedural default.

Again, I would not decide that question today. All that is required of Medellín now is to show that his case is debatable. He has done at least that much. Because of the COA posture, we cannot, and I would not, construe Article 36 definitively here. I would conclude only that Medellín's arguments about the treaty themselves warrant a COA.

## IV

For the reasons explained, I would vacate the Court of Appeals' decision to deny Medellín a COA with which to proceed, and remand for further proceedings. After we granted certiorari in this case, the President informed his Attorney General that the United States would discharge its obligations under the *Avena* judgment "by having State courts give effect to the decision." George W. Bush, Memorandum for the Attorney General (Feb. 28, 2005), App. 2 to Brief for United States as *Amicus Curiae* 9a. Medellín has since filed a successive petition in state court. It is possible that the Texas court will grant him relief on the basis of the President's memorandum. On remand, the Court of Appeals for the Fifth Circuit may have wished to consider that possibility when scheduling further federal proceedings, and to hold the case on its docket until Medellín's successive petition was resolved in state court. See *Landis* v. *North American Co.*, 299 U. S. 248, 254 (1936).

JUSTICE SOUTER, dissenting.

After the Court of Appeals denied the certificate of appealability (COA) necessary for Medellín to appeal the District Court's denial of his claim for relief under the Vienna Convention on Consular Relations, we granted certiorari on two questions bearing on the order barring further appeal: (1) whether the judgment of the International Court of Jus-

tice (ICJ) in *Case Concerning Avena and other Mexican Nationals (Mex. v. U. S.)*, 2004 I. C. J. No. 128 (Judgment of Mar. 31) *(Avena)*, supporting petitioner's right to litigate a claimed violation of the Convention, and to litigate free of state and federal procedural bars, is preclusive in our domestic courts; and (2) whether *Avena* and the ICJ's earlier judgment in *LaGrand Case (F. R. G. v. U. S.)*, 2001 I. C. J. 466 (Judgment of June 27), are at least entitled to enforcement for the sake of comity or uniform treaty interpretation. Prior to argument here, the President advised the Attorney General that the United States would discharge its international obligations under the *Avena* judgment "by having State courts give effect to the decision." Memorandum for the Attorney General (Feb. 28, 2005), App. 2 to Brief for United States as *Amicus Curiae* 9a. Medellín accordingly has gone back to state court in Texas to seek relief on the basis of the *Avena* judgment and the President's determination. Since action by the Texas courts could render moot the questions on which we granted certiorari (not to mention the subsidiary issues spotted in the *per curiam* and dissenting opinions), I think the best course for this Court would be to stay further action for a reasonable time as the Texas courts decide what to do; that way we would not wipe out the work done in this case so far, and we would not decide issues that may turn out to require no action. We would, however, remain in a position to address promptly the Nation's obligation under the judgment of the ICJ if that should prove necessary.

Because a majority of the Court does not agree to a stay, I think the next best course would be to take up the questions on which certiorari was granted, to the extent of their bearing on the conclusion of the Court of Appeals that there was no room for reasonable disagreement, meriting a COA, about Medellín's right to relief under the Convention. The Court of Appeals understandably thought itself constrained by our decision in *Breard* v. *Greene*, 523 U. S. 371 (1998) *(per*

*curiam),* which the court viewed as binding until this Court said otherwise. It is of course correct to face the possibility of saying otherwise today, since Medellín's case now presents a Vienna Convention claim in the shadow of a final ICJ judgment that may be entitled to considerable weight, if not preclusive effect. This case is therefore not *Breard,* and the Court of Appeals should be free to take a fresh look.

That is one of several reasons why I join JUSTICE O'CONNOR's dissenting opinion, but I do so subject to caveats. We should not at this point limit the scope of proceedings on remand; the issues outlined in Part III–B of JUSTICE O'CONNOR's opinion are implicated here by Medellín's request that domestic courts defer to the ICJ for the sake of uniform treaty interpretation. Whether these issues would be open for consideration by the Court of Appeals in their own right, independent of the ICJ's judgment, is not before us here, nor should our discussion of them and other matters in Part III be taken as limiting the enquiry by the Court of Appeals, were a remand possible. I would, however, limit further proceedings by providing that the Court of Appeals should take no further action until the anticipated Texas litigation responding to the President's position had run its course, since action in the Texas courts might remove any occasion to proceed under the federal habeas petition. Taking JUSTICE O'CONNOR's proposed course subject to this limitation would eliminate the risk of further unnecessary federal rulings, but would retain federal jurisdiction and the option to act promptly, which petitioner deserves after litigating this far.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

I agree with JUSTICE GINSBURG that, in light of recent developments, this Court should simply grant Medellín's motion for a stay. See *ante,* at 668 (concurring opinion); see

also *ante,* at 691 (SOUTER, J., dissenting). But, in the absence of majority support for a stay, I would vacate the Fifth Circuit's judgment and remand the case rather than simply dismiss the writ as improvidently granted. I join JUSTICE O'CONNOR's dissent, for she would do the same. See *ante,* at 677, 690.

For one thing, Medellín's legal argument that "American courts are now bound to follow the ICJ's decision in *Avena*" is substantial, and the Fifth Circuit erred in holding the contrary. *Ante,* at 682 (O'CONNOR, J., dissenting); see 371 F. 3d 270, 279–280 (2004). By vacating its judgment and remanding the case, we would remove from the books an erroneous legal determination that we granted certiorari to review.

Nor would a remand "invite the Fifth Circuit to conduct proceedings rival to those" unfolding in the Texas courts. *Ante,* at 668 (GINSBURG, J., concurring). Rather, I should expect the Fifth Circuit to recognize two practical circumstances that favor its entering a stay. See *ante,* at 690 (O'CONNOR, J., dissenting); see also *ante,* at 692 (SOUTER, J., dissenting).

First, the President has decided that state courts should follow *Avena.* See *Case Concerning Avena and Other Mexican Nationals (Mex.* v. *U. S.),* 2004 I. C. J. No. 128 (Judgment of Mar. 31); George W. Bush, Memorandum for the Attorney General (Feb. 28, 2005), App. 2 to Brief for United States as *Amicus Curiae* 9a. And that fact permits Medellín to argue in the Texas courts that the President's determination—taken together with (1) the self-executing nature of the treaty, (2) the Nation's signature on the Optional Protocol, (3) the International Court of Justice's (ICJ) determination that the United States give Medellín (and 50 other Mexican nationals) *"judicial,"* i. e., court, "review and reconsideration" of their Convention-based claims, "by means of [the United States'] own choosing," and (4) the United States' "undertak[ing]" in the United Nations Charter to

comply with ICJ judgments—requires Texas to follow the *Avena* decision in Medellín's case. *Avena, supra,* ¶¶ 138–143, 153(9) (emphasis added); Charter of the United Nations, Art. 94.1, 59 Stat. 1051; cf. *Ware* v. *Hylton,* 3 Dall. 199, 237 (1796) (treaties "superior to the Constitution and laws of any individual state" (emphasis deleted)); *Sale* v. *Haitian Centers Council, Inc.,* 509 U. S. 155, 188 (1993) (President possesses "unique responsibility" for the conduct of "foreign . . . affairs"); see also *American Ins. Assn.* v. *Garamendi,* 539 U. S. 396, 414–416 (2003) (President has a degree of independent authority to pre-empt state law); Tex. Code Crim. Proc. Ann., Arts. 11.01, 11.071 (Vernon 2005) (Texas courts possess jurisdiction to hear Medellín's claims).

Second, several Members of this Court have confirmed that the federal questions implicated in this case are important, thereby suggesting that further review here after the Texas courts reach their own decisions may well be appropriate. See *ante,* at 672 (GINSBURG, J., concurring) (it is "this Court's responsibility" to address and resolve any significant legal ICJ-related issues that may arise in the state-court proceedings).

The first consideration means that Medellín's claims when considered in state court are stronger than when considered in federal court—and suggests the very real possibility of his victory in state court. The second consideration means that a loss in state court would likely be followed by review in this Court. Taken together they mean that, by staying the case on remand, the Fifth Circuit could well avoid the need for any further federal proceedings, or at least obtain additional guidance from this Court before taking further action. Given these practical circumstances, it seems to me unlikely that, were we to remand this case, the Fifth Circuit would move forward on its own, rather than stay its hand until the conclusion of proceedings in the state courts and possibly here.

For these reasons and those set forth by JUSTICE O'CON-NOR, I agree with the course of action she suggests and respectfully dissent from the Court's decision to dismiss the writ.