[No. S141480. June 29, 2009.]

In re OMAR FUENTES MARTINEZ on Habeas Corpus.

## Counsel

Chet L. Taylor and Sandra L. Babcock for Petitioner Omar Fuentes Martinez.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Ivy Fitzpatrick, Deputy Attorneys General, for Respondent State of California.

## Opinion

**MORENO, J.**—Petitioner Omar Fuentes Martinez is a convicted capital defendant. We affirmed his judgment on appeal. (*People v. Martinez* (2003) 31 Cal.4th 673 [3 Cal.Rptr.3d 648, 74 P.3d 748].) In his previous habeas corpus petition in 2002, petitioner contended that he is a Mexican national and that United States law enforcement authorities failed to inform him of his right to consular notification and assistance under the Vienna Convention on Consular Relations, April 24, 1963, article 36, 21 U.S.T. 77, T.I.A.S. No. 6820 (the Vienna Convention). On October 13, 2004, we denied the petition, in its entirety, on its merits.

In his previous petition, petitioner noted, but made no argument regarding, the then recent decision of the International Court of Justice (ICJ) in *Case Concerning Avena and Other Mexican Nationals (Mexico v. U.S.)* 2004 I.C.J. 12 (Judg. of Mar. 31) (*Avena*). In *Avena*, the ICJ concluded that the United States had violated the Vienna Convention rights of 51 Mexican nationals then on death row, including petitioner, by failing to comply with Vienna Convention article 36's consular notification requirement (article 36). The ICJ directed the courts of the United States to review the convictions and sentences of those Mexican nationals to determine whether, as a result of the violation, they suffered actual prejudice. The ICJ specifically forbade applying procedural default doctrines to bar the required review and reconsideration. (2004 I.C.J. at pp. 63, pars. 133–134, 66, par. 141.)

On February 28, 2005, President George W. Bush issued a "Presidential Memorandum" directing state courts to give effect to the *Avena* decision in accordance with general principles of comity.

Based on the *Avena* decision and the President's memorandum, petitioner filed the instant petition asserting that "[t]he Presidential determination regarding state compliance with the rule announced in the ICJ in *Avena* constitutes a new factual and legal development that was previously unavailable and which entitle[s] petitioner to review of his claim here." On February 14, 2007, we issued an order to show cause why petitioner should not be granted the relief he sought.

While the petition was pending in this court, the United States Supreme Court granted certiorari in *Medellin v. Texas* (2008) 552 U.S. 491 [170 L.Ed.2d 190, 128 S.Ct. 1346], a case involving another of the *Avena* defendants who, like petitioner here, had sought reconsideration of his capital conviction in light of *Avena* and the Presidential Memorandum. Accordingly, on May 23, 2007, we issued an order directing petitioner to file his reply 30 days after finality of the Supreme Court's decision in *Medellin*, and allowing the Attorney General an opportunity to respond. On March 25, 2008, the Supreme Court issued its opinion in *Medellin*, holding that neither *Avena* nor the Presidential Memorandum created binding federal law that would preempt state procedural limitations on the filing of successive habeas corpus petitions.

■ In light of *Medellin*, we conclude that petitioner is precluded from renewing his Vienna Convention claim because he previously raised the issue and we denied relief on its merits. Therefore, his petition is successive, and he fails to demonstrate any change of circumstance or the applicability of any exception to the procedural bar of successiveness that would warrant our reconsideration of his claim.[1] Therefore, we dismiss the order to show cause and deny the petition.

## I. STATEMENT OF FACTS AND THE CASE

The facts are drawn from petitioner's automatic appeal. (*People v. Martinez, supra*, 31 Cal.4th at pp. 678–680.)

Petitioner's murder conviction arises from the 1988 murder of Victor Castillo in Riverside County. Castillo and Jose Manuel Meza performed casual labor for petitioner. Petitioner owed back wages to Castillo, Meza, and some other laborers, but when confronted by these men, petitioner showed hostility and reluctance to pay. On at least two occasions, petitioner displayed firearms, including a machine gun. About a week before the murder, Raul Ibarra confronted petitioner and told him to pay "all those guys" the money he owed them. Petitioner pointed a firearm at Ibarra and told him to mind his own business. On the day before Castillo's murder, Meza filed a complaint for back wages with the Labor Commissioner.

On the evening of November 4, 1988, Castillo joined Meza, Jose Borquez, and others talking and drinking beer outside the Victoria Street home of Meza's brother. Petitioner drove by in his blue Toyota automobile, with his friend Jose Abel Camacho in the passenger's seat. Castillo approached the car, and when he was about five feet away, petitioner shouted "Here you are, motherf—r," raised his AK-47 rifle and fired at Castillo two or three times, killing him.

Petitioner next drove to Ibarra's home on Grove Street, where Leonardo Armenta was visiting. Armenta heard gunshots and went outside, where he saw petitioner driving his blue Toyota. Someone else was with him, probably

---

[1] Although not raised by the Attorney General or discussed by either party, also relevant to this case is the related procedural bar of repetitiveness. "It is, of course, the rule that a petition for habeas corpus based on the same grounds as those of a previously denied petition will itself be denied when there has been no change in the facts or law substantially affecting the rights of the petitioner." (*In re Martin* (1987) 44 Cal.3d 1, 27, fn. 3 [241 Cal.Rptr. 263, 744 P.2d 374]; see *In re Miller* (1941) 17 Cal.2d 734, 735 [112 P.2d 10].) In this case, the petition is not only barred as successive but also because it is repetitive.

Camacho. As petitioner approached the house, he raised an AK-47 rifle and commenced firing at Armenta, who ran inside. Armenta thought he could distinguish two different rifles being fired. Approximately 45 bullets were fired into the house, but no one was harmed—although one bullet missed Armenta by only a foot. This incident led to attempted murder and firearm discharge counts against petitioner.

Officers Kilmer and Lino spotted petitioner's car headed away from Riverside. One taillight was out and the car was weaving from side to side. The officers ordered petitioner and Camacho to stop and exit the car. Petitioner was unsteady and appeared to be intoxicated. The officers handcuffed the men and noticed the car's left and right rear windows were shattered. They discovered loaded firearms in the car and numerous spent casings scattered throughout. The officers performed a field sobriety test on petitioner and concluded he was intoxicated. The officers arrested and transported petitioner and Camacho to county jail. A followup investigation produced additional circumstantial evidence linking petitioner to the crimes.

The defense attempted to cast doubt on the prosecution's version of the shootings. Witnesses Meza and Borquez, contrary to their earlier testimony, now indicated they had not seen petitioner shooting at them or Castillo. The defense also called Camacho, who denied that he or petitioner had fired shots at anyone, contrary to his earlier testimony at his own trial that petitioner had fired his rifle at the Victoria Street and Grove Street locations. Camacho testified that on the day of the shootings, petitioner and some other men had spent two hours shooting and drinking beer. Camacho indicated that they had been drinking earlier as well, and that petitioner drank many more beers than the other men. Later that day, petitioner drank more beer and also used cocaine and speed.

Following the guilt verdicts, the prosecution presented uncontradicted evidence on the special circumstance allegation. The jury found true the allegation that petitioner, on May 16, 1980, had been convicted of the murder of Antonio LeFosse, in violation of section 19.02, subdivision (a)(1), of the Texas Penal Code, a special circumstance within the meaning of California Penal Code section 190.2, subdivision (a)(2).

At the penalty phase, the prosecution introduced the evidence underlying petitioner's Texas homicide conviction. The prosecution also introduced evidence that petitioner had pointed a firearm at an apartment manager in Riverside, and had possessed a homemade metal "shank" concealed in a mattress cover in his jail cell. The defense introduced evidence of petitioner's Mexican background, his poverty and difficult upbringing, and his life in the United States. On rebuttal, the prosecutor introduced evidence of petitioner's

disciplinary problems in a Texas prison, his transfer to a Mexican prison, and his failure to report to authorities while on limited leave from that prison.

Following the penalty phase, the jury returned a death sentence. As noted, we affirmed the judgment. (*People v. Martinez, supra*, 31 Cal.4th at p. 704.)

On December 13, 2002, petitioner filed his first petition for writ of habeas corpus in this court. Petitioner's sixth claim asserted that law enforcement authorities violated his right to consular notification under the Vienna Convention. Petitioner stated that he is a Mexican national, a fact of which the police were aware because the booking records report his place of birth as Mexico.

The petition asserted that, notwithstanding their knowledge, police failed to inform petitioner of his right to contact the Mexican consulate. According to a declaration of the Mexican Consul General, had the consulate been informed, it would have treated petitioner's case as a "high priority situation," and would have "contact[ed] him as soon as possible in order to explain how the Consulate [might] assist him and his attorney in his defense." Specifically, "Mexican consular officials assist the defense in obtaining evidence, including documentary evidence from Mexico, in locating and transporting witnesses from Mexico to the United States to testify, and in ensuring that the Mexican national has . . . adequate representation and interpretation assistance during the trial. The Consulate attempts to satisfy any particular request from defense attorneys for assistance or information when such assistance or information is within our power to provide."

According to petitioner, during jury selection—which was four years after his arrest—he asked his attorney to request a continuance so he could obtain the assistance of the Mexican consulate. His attorney did so, reluctantly, because he said he had "been able to arrange whatever we thought was necessary without going through the consulate, and because I can make no representation as to what the consulate can do for him in this matter, other than what we are doing—I am doing as his counsel and our office is doing as his counsel." Asked by the court to explain his request, petitioner said he wanted the continuance to "find out what the consulate might be able to do for me." The court denied the request but saw "no problem" with petitioner contacting the consulate.

Petitioner's first petition went on to state that, after he was convicted and sentenced, habeas corpus counsel sought the assistance of the Mexican consulate in locating witnesses in Mexico that neither the prosecution nor defense had been able to find during trial. One of those witnesses was Leonardo Armenta, the attempted murder victim. Petitioner asserted that

Armenta would have testified that he did not recognize petitioner as the shooter, contrary to the testimony he gave at the preliminary hearing, which was read at petitioner's trial.

The other potential witness was petitioner's brother, Maximino "Chimino" Aviles who, petitioner asserted, would have been able to provide a "wealth of information regarding petitioner's background at the penalty phase. For example, Chimino reported the problems petitioner had in learning to speak as a young child; Chimino also witnessed head injuries suffered by petitioner; Chimino remembered petitioner and his siblings being so terrorized by their father's cruelty that they urinated and defecated upon his approach; Chimino would also have been able to provide information regarding the multigenerational and widespread alcoholism in the family." Thus, petitioner asserted the failure of the police, the trial court, and petitioner's own trial counsel to ensure compliance with the Vienna Convention "was prejudicial to petitioner's defense at both guilt and penalty phases of his trial and requires reversal of his convictions and sentence of death." In a subsequent letter, habeas corpus counsel called our attention to the *Avena* decision but made no specific argument as to its applicability to this case.

In an order filed on October 20, 2004, we stated, in pertinent part: "The petition filed on December 13, 2002, is denied on the merits."

The instant petition was filed on February 14, 2006. The basis of petitioner's renewal of his Vienna Convention claim was "a major event" that had occurred since the denial of his first petition: "On February 28, 2005, President Bush determined that the United States would comply with [the] ICJ's judgment in the *Avena* case by requiring state court review and reconsideration of the effect of the consular rights violations in all of the 51 cases named in the *Avena* judgment, including petitioner's." Petitioner argued that the Presidential Memorandum "preempts inconsistent state law," under the supremacy clause (U.S. Const., art. VI, cl. 2), particularly "any state procedural rules." Petitioner maintained that the Presidential Memorandum "establishes a 'binding federal rule' and hence constitutes the supreme law of the Land. [Citation.] The determination gives Petitioner the right to enforce the *Avena* judgment in a proceeding filed in state court, and requires the state court to adhere to the *Avena* judgment in any such proceeding. [¶] Petitioner respectfully requests an evidentiary hearing to determine the claim herein. After the evidentiary hearing petitioner requests this court reverse his conviction and order a new trial on grounds that the trial court and trial counsel prejudicially deprived him [of] his Constitutional Rights."

Thus, petitioner's renewed claim was specifically premised on his theory that the Presidential Memorandum constituted binding federal law that overrode any state procedural bar to the renewal of the claim. The exhibits attached to the petition to establish prejudice were the same exhibits as had been attached to the first petition, including the declarations of petitioner's brother and the Mexican Consul General; Armenta's declaration was not resubmitted. Petitioner made no new claim of prejudice as a result of violation of the Vienna Convention nor did he submit any new evidence of prejudice.

We issued an order to show cause why relief should not be granted on grounds "(1) that this court is bound by the judgment of the International Court of Justice in *Avena and Other Mexican Nationals (Mex. v. U.S.)* . . . under the Supremacy Clause (U.S. Const., art. VI, cl. 2), and/or the Presidential Directive issued on February 28, 2005 directing the courts of the United States to give effect to the *Avena* decision as a matter of comity, and (2) that, pursuant to the *Avena* decision, this court is required to order an evidentiary hearing addressing whether petitioner suffered actual prejudice as a result" of the violation of his Vienna Convention right to consular notification.

In his return, the Attorney General argued that the petition was barred under the procedural bar of successiveness. (*In re Clark* (1993) 5 Cal.4th 750, 774 [21 Cal.Rptr.2d 509, 855 P.2d 729].) The Attorney General maintained that the Presidential Memorandum was not a mandatory order requiring suspension by state courts of procedural bars with respect to the *Avena* litigants or, if it was, it exceeded the President's constitutional authority. The Attorney General argued, further, that petitioner had failed to demonstrate that he fell into the miscarriage of justice exception for successive petitions.[2] Finally, the Attorney General repeated his arguments that petitioner had failed to demonstrate any prejudice as a result of any violation of his Vienna Convention rights.

While the petition was pending, the United States Supreme Court granted certiorari in the *Medellin* case. As petitioner subsequently conceded, the grounds on which we issued our order to show cause in this case were "essentially identical to the questions presented in" *Medellin*. Therefore, on May 23, 2007, we directed petitioner to serve and file his reply 30 days after the finality of the Supreme Court's decision in that case, and permitted the Attorney General to file a supplemental return addressing the effect of such decision on this case.

---

[2] The Attorney General alternatively argued the petition was untimely because petitioner had waited nearly a year from the issuance of the Presidential Memorandum to file the instant petition.

The Supreme Court issued its decision in *Medellin* on March 25, 2008. Upon finality, petitioner filed his traverse. Petitioner acknowledged that, in *Medellin*, the Supreme Court held "that neither *Avena* nor the President's Memorandum constitutes directly enforceable federal law that pre-empts state limitations on the filing of successive habeas petitions." (*Medellin v. Texas, supra,* 552 U.S. at p. 498 [128 S.Ct. at p. 1353].) Nonetheless, petitioner argued both that *Medellin* acknowledged the existence of individually enforceable rights to consular notification and assistance under the Vienna Convention and that nothing in the decision "prevents a state court from granting the ICJ remedy of 'review and reconsideration.' " Furthermore, noting that the Mexican government had, in light of *Medellin*, affirmed its commitment to the enforcement of *Avena*, and the possibility of congressional action, petitioner requested that we stay proceedings in his case to allow "nonjudicial processes to be pursued."

In his response, the Attorney General contended that *Medellin* "directly supports respondent's position that, because . . . *Avena* and the Presidential Memorandum do not preempt this State's procedural bars and do not qualify as previously unavailable factual or legal bases, the Court should summarily deny Martinez's petition as procedurally barred." Petitioner filed a responsive brief in which, for the first time, he argued that *Medellin* supported his claim that his petition was not successive but based on previously unavailable law and facts for the following reasons: (1) he was entitled to "appropriate accommodations" for his request for consular notification, e.g., his request for a continuance should have been granted; (2) *Medellin* established a three-working-day requirement for United States authorities to comply with his request for consular notification; and (3) his showing regarding the assistance that might have been rendered by prompt consular assistance constituted a prima facie showing entitling him to relief.

## II. DISCUSSION

### A. *Habeas Corpus Procedure*

■ A petition for writ of habeas corpus initiates judicial proceedings to determine the lawfulness of the petitioner's confinement. (*People v. Romero* (1994) 8 Cal.4th 728, 738 [35 Cal.Rptr.2d 270, 883 P.2d 388].) Because such a petition "seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) At the pleading stage, the petition must state a prima facie case for relief. To that end, the petition "should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available

documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." (*Ibid.*; see also, e.g., *In re Sassounian* (1995) 9 Cal.4th 535, 547 [37 Cal.Rptr.2d 446, 887 P.2d 527]; *In re Hochberg* (1970) 2 Cal.3d 870, 875, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1].)

Next, the petitioner must avoid any procedural bar that would prevent the court from reaching the merits of the claim. (See *People v. Romero, supra*, 8 Cal.4th at p. 737; *In re Clark, supra*, 5 Cal.4th at p. 769, fn. 9; see also *Clark*, pp. 764–765 & fn. 3.) "Such rules are necessary both to deter use of the writ to unjustifiably delay implementation of the law, and to avoid the need to set aside final judgments of conviction when retrial would be difficult or impossible." (*Clark*, at p. 764.)

■ In this case, the Attorney General contends that the petition is subject to the procedural bar of successiveness. "It has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected. [Citations.] The court has also refused to consider newly presented grounds for relief which were known to the petitioner at the time of a prior collateral attack on the judgment. [Citations.] This rule was stated clearly in *In re Conner* [(1940)] 16 Cal.2d 701, 705 [108 P.2d 10]: 'In this state a defendant is not permitted to try out his contentions piecemeal by successive proceedings attacking the validity of the judgment against him.' " (*In re Clark, supra*, 5 Cal.4th at pp. 767–768.)

■ This procedural bar is subject to exceptions. For example, "where the factual basis for a claim was unknown to the petitioner and he had no reason to believe that the claim might be made, or where the petitioner was unable to present his claim, the court will continue to consider the merits of the claim if asserted as promptly as reasonably possible." (*In re Clark, supra*, 5 Cal.4th at p. 775.) Another exception to the general rule that "absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied," is "petitions which allege facts which, if proven, would establish that a fundamental miscarriage of justice occurred as a result of the proceedings leading to conviction and/or sentence." (*Id.* at p. 797.)

"[A] 'fundamental miscarriage of justice' will have occurred in any proceeding in which it can be demonstrated: (1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; (3) that the death penalty was imposed by a sentencing

authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death; (4) that the petitioner was convicted or sentenced under an invalid statute. These claims will be considered on their merits even though presented for the first time in a successive petition or one in which the delay has not been justified." (*In re Clark, supra*, 5 Cal.4th at pp. 797–798, fns. omitted.)

### B.   *Absent Justification, the Current Petition Is Procedurally Barred*

Before we address the status of petitioner's current petition, we feel compelled to point out that this is not a case where petitioner's notification claim has not been considered by this court on its merits. As already noted, petitioner's first habeas corpus petition asserted a violation of his Vienna Convention rights by police and the trial court. We reviewed and considered that claim, including, of course, whether petitioner was prejudiced by any violation of his article 36 rights. Thus, consistent with our own prior decisions, as well as that of the United States Supreme Court, we assumed for purposes of review that petitioner had individually enforceable rights under article 36. (*People v. Cook* (2006) 39 Cal.4th 566, 600 [47 Cal.Rptr.3d 22, 139 P.3d 492]; *Breard v. Greene* (1998) 523 U.S. 371, 376–378 [140 L.Ed.2d 529, 118 S.Ct. 1352].)[3] Specifically, we reviewed the declarations of the Mexican Consul General and the two witnesses whose presence the Mexican consulate would have obtained during his trial, Leonardo Armenta and Maximino Aviles, to determine whether petitioner was prejudiced either because he was denied the assistance the Mexican government could have provided him or denied the presence of these witnesses at his trial. In so doing, we effectively complied with the ICJ's directive, discussed in greater detail below, that the cases of the 51 Mexican nationals at issue in *Avena* be reviewed and reconsidered in light of the asserted violation of their article 36 right to consular notification to determine whether, as a result of that violation, those individuals suffered "actual prejudice." (*Avena, supra*, 2004 I.C.J. at p. 60, par. 121.) We denied the petition on its merits. Thus, this court has already considered petitioner's article 36 claim without reference to any procedural bar.

As petitioner's counsel conceded at argument, the current petition presents no new evidentiary showing that he suffered actual prejudice as a result of the asserted violation of his article 36 rights. Indeed, his current petition withdraws the declaration of Armenta that was part of his first petition, so there is even less of a factual showing in support of his claim of prejudice. Rather,

---

[3] We continue to adhere to this approach, assuming, without deciding, that article 36 confers individual rights on foreign nationals.

petitioner maintains that the *Avena* decision and the Presidential Memorandum constituted a change in the law, unavailable to him at the time he filed his first petition, that now requires us to review and reconsider his conviction and sentence, notwithstanding any state procedural bar. In other words, unlike every other habeas corpus petitioner, even those advancing substantial constitutional claims, petitioner maintains that he is entitled to a *second* round of review of a claim we have already reviewed and rejected on its merits even though the claim is based on essentially the same factual showing previously advanced because, according to petitioner's reading of *Avena* and the Presidential Memorandum, procedural defaults cannot be applied to the cases of the 51 Mexican nationals named in *Avena.*

■ We would be dubious about this reading of *Avena* even in the absence of the Supreme Court's decision in *Medellin, supra*, 552 U.S. 491 [128 S.Ct. 1346]. In any event, *Medellin* has eviscerated petitioner's claim. The effect of *Medellin* is to restore the status quo ante that existed before *Avena* and the Presidential Memorandum, under which a state may reject a habeas corpus petition raising a Vienna Convention claim as procedurally barred.

C. *The Basis of Petitioner's Justification for Filing the Instant Petition Was Eviscerated by* Medellin

1. Avena *and the Presidential Memorandum*

The United States is a signatory to the Vienna Convention, 21 U.S.T. 77, and its Optional Protocol to the Vienna Convention on Consular Relations Concerning the Compulsory Settlement of Disputes, April 24, 1963, 21 U.S.T. 325, T.I.A.S. No. 6820 (Optional Protocol).

Article 36 of the Vienna Convention provides: "1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State: [¶] (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State; [¶] (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph; [¶] (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and

correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action. [¶] 2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under the Article are intended." (Vienna Convention, art. 36, 21 U.S.T. at pp. 100–101.)[4]

The Optional Protocol provides that disputes "arising out of the interpretation or application of the [Vienna] Convention shall lie within the compulsory jurisdiction of the International Court of Justice." (Optional Protocol, art. 1, 21 U.S.T. at p. 326.)[5]

Petitioner was among the 54 Mexican nationals convicted of a capital offense on behalf of whom Mexico instituted proceedings in the ICJ, in which it asked the ICJ to find that the United States had violated article 36. (*Avena, supra,* 2004 I.C.J. at pp. 19–20, par. 12.) The ICJ concluded that in the cases of 51 of the Mexican nationals the United States had breached its obligation under article 36 "to inform detained Mexican nationals of their rights" under that article and "to notify the Mexican consular post of the [their] detention," as a result of which the United States further violated its article 36 obligation to permit consular officers "to communicate with and have access to their nationals, . . . to visit their detained nationals" and "to enable Mexican consular officers to arrange for legal representation of their nationals." (*Avena,* at pp. 53–54, par. 106(1)–(4).)

Having concluded that the United States breached its obligations under article 36 as to the 51 Mexican nationals, including petitioner, the ICJ addressed "what legal remedies should be considered for the breach." (*Avena, supra,* 2004 I.C.J. at p. 58, par. 115.) The ICJ rejected Mexico's request for annulment of the convictions and sentences. (*Id.* at p. 60, par. 123.) Instead,

---

[4] In the terminology of article 36, the "sending State" is the place of origin of the arrested or detained national while the "receiving State" is the place where he or she has been arrested or detained. In this case, Mexico is the sending state and the United States is the receiving state.

[5] The basic source of the jurisdiction of the ICJ is found in article 94.1 of the United Nations Charter, which states that "[e]ach member of the United Nations undertakes to comply with the decision of the International Court of Justice in any case to which it is a party" (U.N. Charter, June 26, 1945, art. 94.1, 59 Stat. 1031, 1051) and article 36.1 of the Statute of the International Court of Justice, which states that "[t]he jurisdiction of the Court comprises all cases which the parties refer to it and all matters specially provided for in the Charter of the United Nations or in treaties and conventions in force." (Stat. of Internat. Ct. J., June 26, 1945, art. 36.1, 59 Stat. 1031, 1060.)

the ICJ prescribed, as a remedy, "review and reconsideration of these nationals' cases by the United States courts . . . with a view to ascertaining whether in each case the violation of Article 36 committed by the competent authorities caused actual prejudice to the defendant in the process of administration of criminal justice." (*Id.* at p. 60, par. 121.) The ICJ explained further: "The question of whether the violations of Article 36, paragraph 1, are to be regarded as having, in the causal sequence of events, ultimately led to convictions and severe penalties is an integral part of criminal proceedings before the courts of the United States and is for them to determine in the process of review and reconsideration. In so doing, it is for the courts of the United States to examine the facts, and in particular the prejudice and its causes, taking account of the violation of the rights set forth in the Convention." (*Id.* at p. 60, par. 122.)

The ICJ concluded further, however, that "this freedom in the choice of means for such review and reconsideration is not without qualification." (*Avena, supra*, 2004 I.C.J. at p. 62, par. 131.) The ICJ explained that the required review and reconsideration must take place "within the overall judicial proceedings relating to the individual defendant concerned," and that procedural default doctrines could not bar the required review and reconsideration. (*Id.* at p. 66, par. 141.) Moreover, the ICJ required that the violation of article 36 be reviewed independently of due process provisions of the United States Constitution. (2004 I.C.J. at p. 63, pars. 133–134.) The ICJ explained: "The rights guaranteed under the Vienna Convention are treaty rights which the United States had undertaken to comply with in relation to the individual concerned, irrespective of the due process rights under United States constitutional law. In this regard, the Court would point out that what is crucial in the review and reconsideration process is the existence of a procedure which guarantees that full weight is given to the violation of the rights set forth in the Vienna Convention, whatever may be the actual outcome of such review and reconsideration." (*Id.* at p. 65, par. 139.)[6]

---

[6] In devising this remedy, the ICJ relied upon an earlier decision in a case that Germany instituted against the United States alleging violation of article 36 as to two brothers, both German nationals, convicted of capital offenses in Arizona. (*LaGrand Case (Germany v. U.S.)* 2001 I.C.J. 466 (June 27).) In *LaGrand*, the ICJ held that article 36 creates individual rights to consular notification and prohibits applying procedural default rules to a challenge brought under article 36. (*LaGrand, supra,* 2001 I.C.J. at p. 497, par. 90.) The ICJ's decision did not benefit the LaGrand brothers, however, as they were executed before the ICJ issued its decision. Therefore, the ICJ also held that, in any future cases in which the United States was found to have violated article 36, the United States must allow review and reconsideration of the violated foreign national's conviction and sentence. (*LaGrand, supra,* 2001 I.C.J. at pp. 513–514, par. 125.)

Following the *Avena* decision, another of the Mexican nationals involved in that proceeding, Jose Ernesto Medellin, brought a petition for writ of habeas corpus in the United States District Court for the Southern District of Texas. In upholding the denial of his petition, the Fifth Circuit Court of Appeals rejected Medellin's reliance on *Avena* as a basis for his claim that his Vienna Convention rights had been violated. (*Medellin v. Dretke* (5th Cir. 2004) 371 F.3d 270, 279–280.) The United States Supreme Court granted certiorari to consider whether federal courts were bound by the *Avena* judgment without regard to procedural default and whether federal courts should give effect to that judgment, as a matter of judicial comity and uniform treaty interpretation. (*Medellin v. Dretke* (2005) 544 U.S. 660, 661 [161 L.Ed.2d 982, 125 S.Ct. 2088] (*per curiam*).)

However, on February 28, 2005, President George W. Bush issued a memorandum that stated in part: "I have determined, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, that the United States will discharge its international obligations under the decision of the International Court of Justice in the *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America) (Avena)*, 2004 ICJ 128 (Mar. 31), by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision."[7] Medellin then filed an application for a writ of habeas corpus in the Texas Court of Criminal Appeals. Observing that the "state-court proceeding may provide Medellin with the very reconsideration of his Vienna Convention claim that he now seeks in the present proceeding," the high court dismissed certiorari as improvidently granted. (*Medellin v. Dretke, supra,* 544 U.S. 660, 662 (*per curiam*).)

2. *The* Medellin *Decision*

The Texas Court of Criminal Appeals dismissed Medellin's habeas corpus petition—his second—because in its view neither the *Avena* decision nor the Presidential Memorandum constituted binding federal law that could displace a state procedural limitation on successive petitions. (*Ex parte Medellin* (Tex.Crim.App. 2006) 223 S.W.3d 315, 352.) The Supreme Court again granted certiorari and affirmed the judgment of the Texas court. (*Medellin v. Texas, supra,* 552 U.S. at p. 498 [128 S.Ct. at p. 1353].) The Supreme Court specifically rejected Medellin's argument that the *Avena* decision and/or the

---

[7] Following the issuance of the Presidential Memorandum, the United States withdrew from the Optional Protocol. (See *Medellin v. Dretke, supra,* 544 U.S. at p. 682 (dis. opn. of O'Connor, J.).)

Presidential Memorandum "is a binding federal rule of decision that pre-empts contrary state limitations on *successive* habeas petitions." (*Id.* at p. 504 [128 S.Ct. at p. 1356], italics added.)

■ With respect to Medellin's claim that *Avena* itself constituted binding federal law, the court examined the treaties through which the United States had submitted to the jurisdiction of the ICJ and concluded that "none of these treaty sources"—the Optional Protocol, the United Nations Charter, and the ICJ statute—were self-executing, and, therefore did not create "binding federal law in the absence of implementing legislation, and because it is uncontested that no such legislation exists, we conclude that the *Avena* judgment is not automatically binding domestic law." (*Medellin v. Texas, supra,* 552 U.S. at p. 506 [128 S.Ct. at p. 1357].)[8]

■ Nor was the court persuaded that the President, acting unilaterally through the Presidential Memorandum, could create such binding domestic law. The court cited "Justice Jackson's familiar tripartite scheme" for "evaluating executive action" in the area of foreign policy decisions. "First, '[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.' [Citation.] Second, '[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.' [Citation.] . . . Finally, '[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb,' and the Court can sustain his actions 'only by disabling the Congress from acting upon the subject.' [Citation.]" (*Medellin v. Texas, supra,* 552 U.S. at pp. 524–525 [128 S.Ct. at p. 1368].) Here, the non-self-executing nature of the treaty sources of ICJ jurisdiction "not only refutes the notion that the ratifying parties vested the President with the authority to unilaterally make treaty obligations binding on domestic courts, but also implicitly prohibits him from doing so. When the President asserts the power to 'enforce' a non-self-executing treaty by unilaterally creating domestic law, he acts in conflict with the implicit understanding of the ratifying Senate. His assertion of authority, insofar as it is based on the pertinent non-self-executing treaties, is therefore within Justice Jackson's third category, not the first or even the second." (*Id.* at p. 527 [128 S.Ct. at p. 1369].)

---

[8] The court explained that "[w]hat we mean by 'self-executing' is that the treaty has automatic domestic effect as federal law upon ratification. Conversely, a 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law. Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress." (*Medellin v. Texas, supra,* 552 U.S. at p. 505, fn. 2 [128 S.Ct. at p. 1356, fn. 2].)

Finally, the court rejected the alternative argument advanced by the President that the memorandum was a valid exercise of his authority to resolve claims disputes with other nations. The court found inapposite the cases cited by the government that involved the making of executive agreements to settle civil claims between American citizens and foreign governments or nations. The court noted, "the Government has not identified a single instance in which the President has attempted (or Congress has acquiesced in) a Presidential directive issued to state courts, much less one that reaches deep into the heart of the State's police powers and compels state courts to reopen final criminal judgments and set aside neutrally applicable state laws. [Citation.] The Executive's narrow and strictly limited authority to settle international claims disputes pursuant to an executive agreement cannot stretch so far as to support the current Presidential Memorandum." (*Medellin v. Texas*, *supra*, 552 U.S. at p. 532 [128 S.Ct. at p. 1372].)

### 3. *Application of* Medellin *to This Petition*

Insofar as petitioner seeks to justify his successive petition on the grounds that *Avena* and/or the Presidential Memorandum constitute binding federal law that overrides state procedural defaults, *Medellin* is a complete and negative response to his argument. Nonetheless, petitioner purports to discern within the *Medellin* decision elements that "support a finding that Petitioner's present petition is based on previously unavailable facts and law."

First, petitioner refers to the Supreme Court's discussion in *Medellin* of its earlier Vienna Convention claim decision, *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331 [165 L.Ed.2d 557, 126 S.Ct. 2669] for the proposition "that a petitioner may request 'appropriate accommodations' from the trial court to secure 'the benefits of consular assistance.'" From this language, petitioner argues he was deprived of such accommodation when the trial court denied his request for a continuance at trial to contact the Mexican consulate. Petitioner is wrong.

*Sanchez-Llamas* consolidated the cases of two foreign nationals, Moises Sanchez-Llamas, a Mexican, and Mario A. Bustillo, a Honduran, both of whom sought review of their convictions—Sanchez-Llamas for attempted murder, among other counts, and Bustillo for first degree murder—based on the asserted failure of law enforcement authorities to comply with article 36. Sanchez-Llamas sought to suppress incriminating statements he had made to the police, notwithstanding that he had waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], as a penalty for violation of his article 36 rights. Bustillo attempted to raise his article 36 claim for the first time in his petition for habeas corpus but the claim was dismissed as procedurally barred because he had failed to raise it at trial or on

direct appeal. (*Sanchez-Llamas v. Oregon, supra*, 548 U.S. at pp. 339–342.) Neither man was one of the 51 individuals named in the *Avena* decision.

The issues in *Sanchez-Llamas* were identified as "(1) whether Article 36 of the Vienna Convention grants rights that may be invoked by individuals in a judicial proceeding; (2) whether suppression of evidence is a proper remedy for a violation of Article 36; and (3) whether an Article 36 claim may be deemed forfeited under state procedural rules because a defendant failed to raise the claim at trial." (*Sanchez-Llamas v. Oregon, supra*, 548 U.S. at p. 342.) In order to respond to the petitioners' claims, the court answered the first question by assuming, without deciding, that such rights could be individually invoked (*id.* at p. 343); held, as to the second question, that neither the Vienna Convention nor the court's own precedents supported application of the exclusionary rule as a remedy for a violation of article 36 rights (548 U.S. at pp. 343–350); and, as to the third question, in an answer that foreshadowed its decision in *Medellin*, held that state procedural defaults did apply to such claim (548 U.S. at p. 360).

Petitioner contends that certain language in *Sanchez-Llamas* was subsequently cited by the Supreme Court in *Medellin* as a basis to create procedural rules requiring states to accommodate defendants who may be foreign nationals with respect to their Vienna Convention rights. But nowhere in *Sanchez-Llamas* itself does the court address this issue, nor do the court's references to *Sanchez-Llamas* in *Medellin* even advert to this issue. To the contrary, the pages in *Medellin* to which petitioner refers us for their discussion of *Sanchez-Llamas* simply reinforce *Medellin*'s conclusion that ICJ decisions are not binding federal law and do not override state procedural rules. (*Medellin v. Texas, supra*, 552 U.S. at pp. 512, fn. 8, 518, 523 [128 S.Ct. at pp. 1361, fn. 8, 1364, 1367].) We are at a loss to perceive in either decision support for petitioner's claim that the trial court in this case was required to have granted his request for a continuance to contact the Mexican consulate. Moreover, this is one of the same claims petitioner raised in his first habeas corpus petition. He provides no justification for revisiting our denial of that petition on this ground.

Second, petitioner asserts that *Medellin* now establishes a three-day rule within which notice to a foreign national of his consular rights must be given to avoid violating the Vienna Convention. Again, petitioner misconstrues the language.

The Supreme Court noted that, in denying *Medellin*'s first application for state postconviction relief, the Texas trial court ruled that the claim was both procedurally barred because Medellin had not raised it at trial and also without merit "finding that Medellin had 'fail[ed] to show that any non-notification of the Mexican authorities impacted on the validity of his

conviction or punishment.' [Citation]." (*Medellin v. Texas, supra,* 552 U.S. at p. 502 [128 S.Ct. at pp. 1354–1355].) In a footnote explaining the trial court's ruling, the Supreme Court observed that the ICJ in *Avena* had concluded that the Vienna Convention's requirement of consular notification " 'without delay' " is satisfied "where notice is provided within three working days," but that in Medellin's case he had confessed within three hours of his arrest, "before there could be a violation of his Vienna Convention right to consulate notification." (*Medellin v. Texas, supra,* 552 U.S. at p. 502, fn. 1 [128 S.Ct. at p. 1355, fn. 1].)

Thus, the Supreme Court did not approve or disapprove the ICJ's three-day rule—indeed, the court's reference to this rule occurred in that portion of its decision describing the procedural history of Medellin's case, not within the decision's analysis of his claims. Moreover, the purpose of this reference was simply to explain the basis of the state trial court's denial of Medellin's application for postconviction relief, not to announce any procedural rule with respect to when consular notification must be made.

Finally, it is clear that in this case petitioner was aware of his right of consular notification by the time of his trial—when he requested a continuance to consult with the Mexican consul. He failed to demonstrate in his first petition, and he fails to demonstrate here, that he suffered any prejudice because he was not notified of those rights at the time of his arrest.

Third, petitioner contends: "*Medellin* establishes for the first time that the requirements of *Breard v. Greene*[, *supra,* 523 U.S. 371] apply to cases addressed under *Avena.* That finding necessarily includes *Breard*'s recognition that the denial of an evidentiary hearing 'prevents [petitioner] from establishing that the violation of his Vienna Convention rights prejudiced him.' " In other words, petitioner maintains that *Breard* requires an evidentiary hearing to resolve the merits of a Vienna Convention claim, and that *Medellin* adopted this holding with respect to the 51 individuals subject to the *Avena* decision.

Petitioner fails to provide a citation to the page in *Medellin* where, according to him, the Supreme Court adopted *Breard*'s requirement of an evidentiary hearing. Our review of *Medellin*'s several citations to *Breard* fails to support his claim. (See *Medellin v. Texas, supra,* 552 U.S. at pp. 513, fn. 9, 517, 528, fn. 14 [128 S.Ct. at pp. 1361, fn. 9, 1363, 1370, fn. 14].) In any event, the premise of petitioner's argument—that *Breard* requires such hearings—is utterly inaccurate. Petitioner cites a portion of *Breard* that concluded a federal habeas corpus petition was barred by the Antiterrorism and Effective Death Penalty Act of 1996's provision that an evidentiary hearing shall not be provided with respect to a federal habeas corpus petition based upon a

violation of treaties of the United States, if the petitioner " 'has failed to develop the factual basis of [the] claim in State court proceedings.' " (*Breard v. Greene, supra*, 523 U.S. at p. 376.) *Breard* concluded that this provision "prevents Breard from establishing that the violation of his Vienna Convention rights prejudiced him. Without a hearing, Breard cannot establish how the Consul could have advised him, how the advice of his attorneys differed from the advice the Consul would have provided, and what factors he considered in electing to reject the plea bargain that the State offered him." (*Ibid.*)

Accordingly, *Breard* held only that the petitioner could not prevail on his habeas corpus claim because federal law precluded an evidentiary hearing when the petitioner had failed to develop his claim in state court. To the extent *Breard* is relevant to this case, it reinforces the Supreme Court's subsequent ruling in *Medellin* that procedural defaults apply to Vienna Convention claims. It certainly does not stand for the proposition for which petitioner advances it—that determination of the merits of such claims requires an evidentiary hearing.

Finally, petitioner argues that he is not required to establish "absolute proof of a different outcome" but only to make a prima facie showing of prejudice. But we determined, in reviewing his first habeas corpus petition, that he had not made a prima facie showing when we denied it on the merits. Again, however, petitioner's factual showing of entitlement to relief has not significantly changed from his original petition to this one.

Next, seizing upon the possibility that either the United States Congress might yet authorize compliance with the *Avena* decision or the Mexican government may continue to press its case through diplomatic channels, petitioner urges us to stay proceedings in this case to see whether either of these efforts bears fruit.[9] Although he initially requests a 90-day stay, there is, of course, no guarantee that any action will have taken place at either the legislative or diplomatic level and he would undoubtedly request a further stay once the initial 90-day stay has expired. Such a course of action would ill serve "the importance of finality of judgments [citation], and the interest of

---

[9] Petitioner points to the Avena Case Implementation Act of 2008, which was introduced in the last session of the Congress on July 14, 2008, and referred to the House Committee on the Judiciary on the same day; no further action was taken on the bill. (See Avena Case Implementation Act of 2008, H.R. No. 6481, 110th Cong., 2d Sess. (2008) (referred to committee July 14, 2008).) He also points to a press statement by the United States Ambassador to Mexico regarding discussions about the implementation of *Avena* but apparently these did not bear fruit either and, with the change in presidential administrations, it is unclear when or whether these discussions will continue.

the state in the prompt implementation of its laws." (*In re Clark, supra,* 5 Cal.4th at p. 764.) We decline to issue such a stay at this juncture.[10]

Finally, we observe that petitioner makes no attempt to bring himself within the miscarriage of justice exception to successiveness as outlined in *Clark.* (*In re Clark, supra,* 5 Cal.4th at pp. 797–798.)

## DISPOSITION

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J., Concurring.**—I concur fully in the majority opinion. I write separately to comment on one aspect of the procedural bar of successiveness. As the majority opinion explains, the successiveness bar is subject to exceptions, one of which applies when a petition alleges facts that, if proved, would establish that a fundamental miscarriage of justice occurred. (Maj. opn., *ante,* at p. 956.) In my view, this court has adopted an overly restrictive definition of that exception, under which the petitioner must show actual innocence or a constitutional error without which "no reasonable judge or jury" would have convicted the petitioner or returned a death verdict. (*In re Clark* (1993) 5 Cal.4th 750, 797 [21 Cal.Rptr.2d 509, 855 P.2d 729].) For the reasons I have previously stated in a separate opinion, "I would adopt instead the test used by the Pennsylvania courts" under which a claim that could have been presented in an earlier petition will be considered on its merits "if the petitioner shows either factual innocence or procedural unfairness of such gravity that 'no civilized society' can tolerate it." (*In re Clark, supra,* at p. 803 (conc. & dis. opn. of Kennard, J.).)

---

[10] We note in this connection that the Supreme Court itself denied a request for a stay of execution in the *Medellin* case advanced on essentially the same grounds as petitioner advances here. (*Medellin v. Texas* (2008) 554 U.S. \_\_\_ [171 L.Ed.2d 833, 129 S.Ct. 360].) Furthermore, the ICJ has recently rejected Mexico's request for an interpretation of *Avena* sparked by Mexico's displeasure at Medellin's execution and its disagreement with the Supreme Court's *Medellin* decision. (See *Request for Interpretation of the Judgment of 31 March 2004 in the Case Concerning Avena and Other Mexican Nationals (Mexico v. U.S.)* 2009 I.C.J. 139 (Judg. of Jan. 19).)

Here, however, it does not matter which definition of "fundamental miscarriage of justice" one applies, because petitioner has not alleged facts that, if proved, would establish a fundamental miscarriage of justice under either definition.