Michelle GUSTAFSON, Plaintiff,

v.

AMERICAN AIRLINES,
INC., Defendant.

Civil Action No. 08–10144–MBB.

United States District Court,
D. Massachusetts.

Sept. 30, 2009.

Tory A. Weigand Morrison, Mahoney, & Miller LLP, Boston, MA, for Defendant.

***MEMORANDUM AND ORDER RE: DEFENDANT AMERICAN AIRLINES, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS (DOCKET ENTRY # 4)***

BOWLER, United States Magistrate Judge.

This action arises out of a fall plaintiff Michelle Gustafson ("plaintiff") experienced while disembarking from an American Airlines flight in Los Angeles on January 16, 2005. The single count amended complaint alleges that the negligent design, manufacture or maintenance of the aircraft by defendant American Airlines, Inc. ("defendant" or "American Airlines") was a direct cause of the fall and resulting injuries. (Docket Entry # 7, Ex. 1).

Defendant sought to dismiss the action in a motion for judgment on the pleadings filed under Rule 12(c), Fed.R.Civ.P. ("Rule 12(c)"). (Docket Entry # 4). After conducting a hearing, this court took the motion (Docket Entry # 4) under advisement.

Because both plaintiff and defendant submitted various exhibits and affidavits to consider in resolving the Rule 12(c) motion, this court converted the motion into a summary judgment motion on May 27, 2009. The May 27, 2009 Procedural Order advised the parties about the content of the record and afforded them up to and including June 15, 2009, to file any additional evidence. On June 15, 2009, both parties submitted additional evidence and memoranda. (Docket Entry ## 14 & 15).

Plaintiff's memorandum objected to the sua sponte conversion and requested "a reasonable opportunity to conduct discovery." (Docket Entry # 14). On July 21, 2009, this court therefore allowed plaintiff seven weeks to conduct additional discov-

William H. DiAdamo, DiAdamo Law Office, LLP, Lawrence, MA, for Plaintiff.

ery. (Docket Entry # 16). During that time period, the parties conducted depositions of plaintiff and defendant's Rule 30(b)(6), Fed.R.Civ.P. ("Rule 30(b)(6)"), deponent. (Docket Entry # 17, Ex. 3; Docket Entry # 19, Ex. 4). On September 9, 2009, plaintiff and defendant filed additional briefs and attached deposition transcripts and documents. With three rounds of briefing complete, the summary judgment motion (Docket Entry # 14) is ripe for review.

## STANDARD OF REVIEW

Summary judgment is designed " 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' " *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 12 (1st Cir.2007). Summary judgment is appropriate when the record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 75 (1st Cir.2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Id.* Facts are viewed in favor of the non-movant, i.e., plaintiff. *See Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.2009).

Viewing the summary judgment facts in plaintiff's favor, they show the following.

## FACTUAL BACKGROUND

American Airlines is an international and domestic airline carrier that serves Logan International Airport ("Logan") in Boston, Massachusetts. (Docket Entry # 3, ¶ 2; Docket Entry # 7, Ex. 1, ¶ 2). In 2004, plaintiff, a 64 year old retired elementary school teacher, belonged to a sailing club. A number of club members decided to take a trip to Puerto Vallarta, Mexico and one of the members, Richard Borjian ("Borjian"), offered to obtain airline tickets for various members of the sailing club including plaintiff. Plaintiff asked Borjian to procure her ticket[s] and expected to give him a $20 "tip" for his efforts. (Docket Entry # 17, Ex. 3).

Borjian, who was also going on the trip, proceeded to book four flights for round trip travel between Boston and Puerto Vallarta via Net Traveler, a ticket agency. (Docket Entry # 14, Ex. 1, ¶ 2; Docket Entry # 14, Ex. 4).[1] Plaintiff did not know the travel agency or internet service Borjian used to purchase the tickets. Her plan, however, was to travel from Boston to Puerto Vallarta, stay in Mexico for a period of time and then return from Puerto Vallarta to Boston. Likewise, her understanding with Borjian was for him to book a trip from Boston to Mexico and then from Mexico back to Boston. (Docket Entry # 17, Ex. 3).

The PNR is captioned "Code Share PNR" thereby evidencing a code sharing arrangement between the two carriers, American Airlines and Alaska Airlines. (Docket Entry # 14, Ex. 4; Docket Entry # 15, Ex. 1, ¶ 6). The October 4, 2004 booking of the flights took place at the same time. (Docket Entry # 14, Ex. 4;

---

1. As hyperlinked on the electronic docket, exhibit four is a passenger name report ("PNR") generated by American Airlines for plaintiff's trip. (Docket Entry # 14, Ex. 4). The document details the booking and code sharing arrangement between American Airlines and Alaska Airlines.

Docket Entry # 15, Ex. 1; Docket Entry # 19, Ex. 4). As set forth in the PNR, the booking consisted of: (1) a ticket on American Airlines flight 25 due to depart from Logan at 8:00 a.m. on January 16, 2005, and arrive in Los Angeles at 11:24 a.m.; (2) a ticket on Alaska Airlines flight 236 due to depart from Los Angeles at 1:30 p.m. on January 16, 2005, and arrive in Puerto Vallarta at 6:26 p.m.; (3) a ticket on Alaska Airlines flight 239 due to depart from Puerto Vallarta at 5:08 p.m. on January 22, 2005, and arrive in Los Angeles at 6:16 p.m.; and (4) a ticket on American Airlines flight 1920 due to depart Los Angeles at 9:50 p.m. on January 22, 2005, and arrive in Boston at 6:13 a.m. the next day. (Docket Entry # 14, Ex. 4). Construing the record and drawing reasonable inferences in plaintiff's favor, as required, the ticket numbers for the American and Alaska Airlines flights are not the same.

After Borjian completed the booking, he emailed plaintiff an itinerary. The itinerary does not identify an American Airlines flight. Rather, it designates four Alaska Airlines flights albeit with the above noted layovers and connections in Los Angeles. Plaintiff received the itinerary which included the $481.74 purchase price and planned to reimburse Borjian the purchase price when she arrived in Puerto Vallarta. Objectively, the itinerary showed the connecting flights in Los Angeles and confirmed that the trip was "from Boston to Mexico and back." (Docket Entry # 17, Ex. 3). Plaintiff also understood that the trip had separate legs but was all part of "one travel from Boston to Mexico and back." (Docket Entry # 17, Ex. 3). As set out in the PNR and at the time of booking, Borjian, acting on plaintiff's behalf, booked a "round-trip ticket from Bos-

ton to Puerto Vallarta and back to Boston." (Docket Entry # 17, Ex. 2). As further indicated in the PNR and communicated to American Airlines at the time of booking, the "flight" was "in four segments" consisting of one segment or leg from Boston to Los Angeles, a second segment from Los Angeles to Puerto Vallarta and the two return segments. (Docket Entry # 19, Ex. 4).

With the itinerary and her passport in hand, plaintiff arrived at Logan on January 16, 2005. Plaintiff checked her bag at curbside, showed her passport[2] and received boarding passes for the Boston to Los Angeles flight and for the Los Angeles to Puerto Vallarta flight. (Docket Entry # 17, Ex. 3). American Airlines scanned plaintiff's single checked bag with a destination of Puerto Vallarta as opposed to Los Angeles. (Docket Entry # 14, Ex. 4; Docket Entry # 15, Ex. 1, ¶ 7).

After having her bag scanned in Boston, plaintiff boarded American Airlines flight 25 direct from Logan to Los Angeles. Los Angeles was the final stop for flight 25 and all of the passengers were disembarking from the aircraft at the time plaintiff fell. (Docket Entry # 6, Ex. 1, ¶ 4; Docket Entry # 14, Ex. 1, ¶ 5). Plaintiff's only purpose for being in Los Angeles was to connect with the Alaska Airlines flight to Puerto Vallarta. She had no other business in Los Angeles. (Docket Entry # 17, Ex. 3).

While walking down the aisle in the process of deplaning from American Airlines flight 25, plaintiff tripped and fell. (Docket Entry # 6, Ex. 1 & 3; Docket Entry # 14, Ex. 1, ¶ 6; Docket Entry # 14, Ex. 5; Docket Entry # 17, Ex. 3). She received treatment for injuries to her

---

**2.** Plaintiff would not need to show her passport if the trip were only from Boston to Los Angeles.

face and head at a first aid station in the airport. The incident report, which does not reference travel to Mexico,[3] reflects the injury as taking place at American Airlines gate 42A. Plaintiff was treated and released at approximately 12:15 p.m. (Docket Entry # 6, Ex. 3).

A few hours later, plaintiff continued her journey and, using a different ticket from the one used for American Airlines flight 25, boarded Alaska Airlines flight 236 direct from Los Angeles to Puerto Vallarta. (Docket Entry # 6, Ex. 3; Docket Entry # 14, Ex. 1, ¶ 9; Docket Entry # 14, Ex. 2; Docket Entry # 17, Ex. 3). Alaska Airlines flight 236 departed from a different terminal than American Airlines flight 25. (Docket Entry # 17, Ex. 3). Plaintiff therefore traveled from Los Angeles to Puerto Vallarta on a different airplane operated by a different carrier. (Docket Entry # 6, Ex. 1).

Consistent with the caption of the PNR, the two flights formed part of a code sharing arrangement between American Airlines and Alaska Airlines. (Docket Entry # 14, Ex. 4; Docket Entry # 15, Ex. 1; Docket Entry # 19, Ex. 4). American Airline's Rule 30(b)(6) deponent defined a code share as "an agreement between airlines to share routes so that each airline can have a presence where [it] may not necessarily have a base." (Docket Entry # 19, Ex. 4).

A snowstorm interrupted the return trip. Upon arriving in Los Angeles, a blizzard delayed plaintiff's flight to Boston resulting in a two night layover in Los Angeles. Plaintiff returned to Boston on January 24, 2005.

## DISCUSSION

■ In seeking summary judgment, defendant maintains that flight 25 was an international flight involving "international carriage" within the meaning of the Montreal Convention.[4] Defendant seeks to obtain the benefit of the two year statute of limitations in article 35 of the Convention. Plaintiff filed this action in January 2008, three years after the accident.

Plaintiff disputes that the flight was international or was part of an international carriage. Put another way, she submits that the Convention does not apply because flight 25 was a domestic flight. It began in Boston and ended in Los Angeles, according to plaintiff. Plaintiff also accurately states that flight 25 never left United States airspace.

■ The determinative issue is the applicability of the Montreal Convention, which by its terms "applies to all international carriage," Montreal Convention, Art. 1(1), and the resulting application of the two year limitations period. If the Montreal Convention applies, it "preempts the remedies of a signatory's domestic law, whether or not the application of the Convention will result in recovery in a particular case."[5] *Best v. BWIA West Indies*

---

3. Plaintiff avers that the incident report shows her "flights to and from Boston to Los Angeles, and does not refer to or mention any travel to or from Mexico." (Docket Entry # 14, Ex. 1, ¶ 10).

4. The treaty is formally known as the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, ICAO Doc. 9740, reprinted in S. Treaty Doc. No. 106–45, 1999 WL 33292734 (henceforth "Montreal Convention" or "Convention").

5. Plaintiff maintains that the failure of the itinerary to identify one of the service providers, i.e., American Airlines for two of the flights, violates 14 C.F.R. § 257.4 ("section 257.4"). Assuming a violation of section 257.4, the regulation at most requires an airline in a code sharing arrangement to provide certain information to passengers. 14 C.F.R. § 257.4. The regulation prescribes a failure to comply as "unfair and deceptive in violation of 49 U.S.C. 41712" ("section 41712"). 14

*Airways Ltd.,* 581 F.Supp.2d 359, 362 (E.D.N.Y.2008); *Ugaz v. American Airlines, Inc.,* 576 F.Supp.2d 1354, 1360 (S.D.Fla.2008); *accord Molefe v. KLM Royal Dutch Airlines,* 602 F.Supp.2d 485, 494–495 (S.D.N.Y.2009).

The Convention "was the product of a United Nations effort to reform the Warsaw Convention 'so as to harmonize the hodgepodge of supplementary amendments and intercarrier agreements of which the Warsaw Convention system of liability consists.' " [6] *Sompo Japan Insurance, Inc. v. Nippon Cargo Airlines Co., Ltd.,* 522 F.3d 776, 780 (7th Cir.2008) (quoting *Ehrlich v. American Airlines, Inc.,* 360 F.3d 366, 371 n. 4 (2nd Cir.2004)). The treaty, which "unifies and replaces" the Warsaw Convention, attempts to "balance the interests of air carriers and potential plaintiffs." *Sompo Japan Insurance, Inc. v. Nippon Cargo Airlines Co., Ltd.,* 522 F.3d at 781 & 789. It achieves this purpose "by limiting air carriers' potential liability to predictable, non-catastrophic damages and also by preserving a plaintiff's right to recover its losses up to a certain amount." *Id.* at 789. The preamble explicitly recognizes " 'the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution.' " *Id.* at 781 (quoting preamble).

Interpretation of an international treaty begins with the language of the treaty unless such language effects a result inconsistent with the parties' intentions. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories' "); *accord Medellin v. Texas,* 552 U.S. 491, 128 S.Ct. 1346, 1357, 170 L.Ed.2d 190 (2008) ("interpretation of a treaty, like the interpretation of a statute, begins with its text"); *Ehrlich v. American Airlines, Inc.,* 360 F.3d at 375 (interpretation of treaty begins "with the text of the treaty and the context in which the written words are used") (interpreting Warsaw Convention). That said, "[T]reaties are construed more liberally than private agreements, and to ascertain their meaning" a court "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); *accord Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (looking "beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties' "); *El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (same). "[T]he Executive Branch's understanding" of treaty obligations is also afforded "considerable

---

C.F.R. § 257.4. Section 41712, in turn, allows the Secretary of Transportation to initiate an investigation and, if necessary, take corrective action against the airline. Section 257.4 does not create an implied private right of action in plaintiff's favor or, given the preemptive effect of the Montreal Convention, allow plaintiff to maintain such a claim in this case.

6. The Warsaw Convention is formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934) (henceforth "Warsaw Convention").

weight." *Medellin v. Dretke*, 544 U.S. 660, 685, 125 S.Ct. 2088, 161 L.Ed.2d 982 (2005).

■ Although the Montreal Convention is undeniably "an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention," *Ehrlich v. American Airlines*, 360 F.3d at 371 n. 4, a number of "the provisions of the Montreal Convention are taken directly from the Warsaw Convention and the many amendments thereto." *Best v. BWIA West Indies Airways Ltd.*, 581 F.Supp.2d at 362. Hence, case law interpreting provisions of the Warsaw Convention applies to cases interpreting "substantively similar" provisions of the Convention. *See Id.; Baah v. Virgin Atlantic Airways Ltd.*, 473 F.Supp.2d 591, 596–97 (S.D.N.Y.2007); *accord Hutchinson v. British Airways PLC*, 2009 WL 959542, *3 (E.D.N.Y. April 6, 2009) (courts rely " 'on cases interpreting a provision of the Warsaw Convention where the equivalent provision in the Montreal Convention was substantively the same' "); *Ugaz v. American Airlines, Inc.*, 576 F.Supp.2d at 1360 ("appropriate to rely on cases interpreting the Warsaw [C]onvention where the equivalent provision of the Montreal Convention is substantively the same"). Conversely stated, case law interpreting substantively different provisions and/or language in the Warsaw Convention is not germane.

Statements made by the executive branch evidencing its understanding of the Montreal Convention support this view. The court in *Baah* aptly quotes the following taken from the Senate Foreign Relations Committee's Report ("report") which, in turn, relied on statements made by the executive branch:

> "In the nearly seventy years that the Warsaw Convention has been in effect, a large body of judicial precedent has been established in the United States. The negotiators of the Montreal Convention intended to preserve these precedents. According to the Executive Branch testimony, '[w]hile the Montreal Convention provides essential improvements upon the Warsaw Convention and its related protocols, efforts were made in the negotiations and drafting to retain existing language and substance of other provisions to preserve judicial precedent relating to other aspects of the Warsaw Convention, in order to avoid unnecessary litigation over issues already decided by the courts under the Warsaw Convention and its related protocols.' "

*Baah v. Virgin Atlantic Airways Ltd.*, 473 F.Supp.2d at 596 (quoting report quoting executive branch testimony) (brackets in original). With these principles in mind, this court turns to the relevant language in the Montreal Convention.

Article 1(1) of the Montreal Convention defines the reach of the treaty. It unambiguously states that, "This Convention applies to all international carriage of persons ... performed by aircraft." Convention, Art. 1(1).

Article 1(2) defines "international carriage" as:

> any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage ..., are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party. Carriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

Convention, Art. 1(2). Plaintiff argues that the Boston to Los Angeles flight was a domestic flight thereby falling within the scope of the latter sentence. She also asserts that the last sentence differs sharply from the Warsaw Convention thereby demanding a different result than cases interpreting article 1(2) of the Warsaw Convention. *See, e.g., Haldimann v. Delta Airlines, Inc.,* 168 F.3d 1324, 1326 (D.C.Cir.1999).[7]

The import of the language in the last sentence of article 1(2) of the Montreal Convention, however, varies only slightly from the import of the language in the corresponding sentence in article 1(2) of the Warsaw Convention. The Warsaw Convention defines "international transportation"[8] as:

> any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party,[9] if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate

or authority of another power, even though that power is not a party to this convention. Transportation without such an agreed stopping place between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention.

Warsaw Convention, Art. 1(2); *Sulewski v. Federal Express Corp.,* 933 F.2d 180, 183 (2nd Cir.1991) (quoting article 1(2) of Warsaw Convention). The last sentence of article 1(2) of the Warsaw Convention corresponds in placement to the last sentence of article 1(2) of the Montreal Convention. The two sentences also use the same language of an "agreed stopping place." Plaintiff nonetheless insists that the language of the last sentence of article 1(2) of the Montreal Convention is "crucially different" because it expressly states that travel "within a 'State Party' is expressly *not* covered." (Docket Entry # 17) (emphasis in original).

Contrary to plaintiff's view, this court finds the provisions substantively similar. The first words of the last sentence of article 1(2) of the Warsaw Convention refer to "Transportation without such an

---

7. See footnote ten.

8. Whereas the Warsaw Convention uses the term "international transportation," the Montreal Convention uses the term "international carriage." The distinction between the two terms is not significant. *Kruger v. United Air Lines, Inc.,* 2007 WL 3232443, *3 (N.D.Cal. Nov. 1, 2007) ("substitution of the word 'carriage' in one agreement for the world 'transportation' in another, if it conveys any difference in meaning at all, is not relevant here"). As explained in the article by article analysis of the treaty submitted to the Senate during the ratification process, "The British term 'carriage,' rather than 'transportation,' is internationally accepted for the title and body of amendments to the Warsaw Convention." *Article–by–Article Analysis of the*

*Convention for the Unification of Certain Rules for International Carriage by Air Done at Montreal May 28, 1999,* reprinted in S. Treaty Doc. No. 106–45, 1999 WL 33292734 (henceforth *"Article by Article Analysis "*). The President transmitted the treaty to the Senate along with a "report of the Department of State, including [the foregoing] article-by-article analysis." *Article by Article Analysis,* 1999 WL 33292734, at *2 (quoting Letter of Transmittal).

9. In quoting article 1(2) of the Warsaw Convention as a means to contrast the language with the same article in the Montreal Convention, plaintiff conveniently omits the above remaining language of article 1(2) in her memoranda. (Docket Entry ## 14 & 17).

agreed stopping place." Warsaw Convention, Art. 1(2). The referenced "agreed stopping place" is defined in the immediately preceding sentence. That sentence defines "international transportation" to include places of departure and destination "within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory . . . . of another power. . . ." Warsaw Convention, Art. 1(2). The next sentence then states that, "Transportation without such an agreed stopping place" between territories of the same party is not international transportation. Warsaw Convention, Art. 1(2). Reading the complete sentence, transportation without the agreed stopping place in the territory of another power but, instead, between the territories of the same contracting party, "shall not be deemed to be international for the purposes of this convention." Warsaw Convention, Art. 1(2). The corresponding sentence in the Montreal Convention likewise states that transportation between two points in the same state without the "agreed stopping place in the territory of another State" is not international carriage. Convention, Art. 1(2).

■ Cases interpreting the substantively similar provision of the Warsaw Convention conclude that when a passenger only has a ticket for domestic travel within the United States without a connecting flight or continued journey to another country, the Warsaw Convention does not apply. *See Georgakis v. Eastern Air Lines, Inc.*, 512 F.Supp. 330, 332 (D.C.N.Y.1981) (paraphrasing earlier decision that where ticket

"authorized purely domestic transportation between Baton Rouge, New Orleans and New York," it was not " 'international travel' "); *see also Haldimann v. Delta Airlines, Inc.*, 168 F.3d at 1324 & 1326 (the plaintiff's purchase of Swissair flight into Washington and Delta domestic flight in single transaction with same Swiss travel agency governed by Warsaw Convention as international travel notwithstanding one week interval between flights).[10]

Not only is the language of articles 1(2) in the Warsaw and Montreal Conventions substantively similar, the analysis of article 1(2) by the State Department submitted to the Senate in conjunction with the Letter of Transmittal by the President during the ratification process of the Montreal Convention[11] did not identify any significant difference with article 1(2) of the Warsaw Convention. Addressing article 1(2) of the Montreal Convention, the analysis informed the Senate that:

> This provision defines "international carriage" as that which originates in the territory of one of the States Party to the Convention and terminates in that of another, or that which originates and terminates in the territory of one State but includes an agreed stop in the territory of another State, regardless of whether that State is a party to the Convention. In accordance with Article 1, paragraphs (2) and (3), "international carriage" includes all segments of an international journey as shown on the ticket, *including domestic segments of*

---

**10.** Plaintiff seeks to avoid the implications of *Haldimann* on the basis of its facts as well as because the decision interprets the Warsaw Convention as opposed to the Montreal Convention. (Docket Entry ## 14 & 17). Because of the similarities between the language of article 1(2) in each convention, the decision provides relevant guidance. That said, even without the decision, the executive branch's

interpretation and the plain language of article 1(2) together with the objective evidence in the record, discussed infra, demonstrate that the carriage, which began and ended in Boston, included an agreed stopping place in Puerto Vallarta according to the parties' agreement.

**11.** See footnote eight.

*an international journey.* Article 1(2) explicitly excludes from the scope of the Convention carriage between two points within the territory of a single State Party without an agreed stop outside the territory of that State (domestic carriage).

*Article by Article Analysis,* 1999 WL 33292734, at *12 (emphasis added). Given the similar language between the two articles and the State Department's failure to identify a material distinction during the ratification process, plaintiff's reliance on the last sentence of article 1(2) of the Montreal Convention as "demand[ing] a different result than the Warsaw [Convention]" (Docket Entry # 14) is unavailing.

In addition to article 1(2) of the Montreal Convention, article 1(3) provides that:

> Carriage to be performed by several *successive carriers* is deemed, for the purposes of this Convention, to be one undivided carriage if it has been *regarded by the parties as a single operation,* whether it had been agreed upon under the form of a single contract or of a series of contracts, and it does not lose its international character merely because one contract or a series of contracts is to be performed entirely within the territory of the same State.

Convention, Art. 1(3) (emphasis added).[12] Article 36 sets out the liability of a successive carrier. *Best v. BWIA West Indies Airways Ltd.,* 581 F.Supp.2d at 363. In contrast, articles 39 to 41 extend liability to contracting carriers, in addition to actual carriers, when the contracting carrier is in a code sharing arrangement[13] with the actual carrier. Montreal Convention, Art. 39; *Best v. BWIA West Indies Airways Ltd.,* 581 F.Supp.2d at 363–364 (chapter five, including articles 39 to 41, "extended liability to ... 'contracting' carriers for harms incurred during carriage by 'actual' carriers, but excepted from that definition successive carriers" and noting that "relationships typically covered by Article 39 include 'code share operations'"). Because the present scenario involves a code sharing arrangement between Alaska Airlines and American Airlines, the two airlines are not "successive carriers" subject to articles 1(3) and 36. Rather, the definition in article 1(2) applies.[14]

■ Whether the trip was international travel within the scope of the article 1(2) of the Montreal Convention is ordinarily governed by objective evidence as opposed to the uncommunicated subjective beliefs of the parties. *See Kruger v. United Air Lines, Inc.,* 2007 WL 3232443, *4 (N.D.Cal. Nov. 1, 2007) (objective evidence

12. The corresponding article in the Warsaw Convention reads as follows:

Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation, whether it has been agreed upon under the form of a single contract or of a series of contracts, and it shall not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party. Warsaw Convention, Art. 1(3).

13. Code sharing is "an arrangement whereby a carrier's designator code is used to identify a flight operated by another carrier." 14 C.F.R. § 257.3(c); *Shirobokova v. CSA Czech Airlines, Inc.,* 376 F.Supp.2d 439, 442 (S.D.N.Y.2005) (quoting definition of code sharing in 14 C.F.R. § 257.3(c)). The parties concur that the circumstances involve a code sharing arrangement between American Airlines and Alaska Airlines.

14. In any event, the result would be the same even if article 1(3) applied because the objective evidence, described infra, establishes that the parties regarded the carriage as a single operation between Boston to Puerto Vallarta and back.

trumps subjective evidence of parties' intent in determining reach of Convention's "international carriage" language); *accord Baah v. Virgin Atlantic Airways Ltd.,* 473 F.Supp.2d at 595 & 597 (subjective intent irrelevant); *see, e.g., Best v. BWIA West Indies Airways Ltd.,* 581 F.Supp.2d at 363 (relying on objective indicators such as interline baggage release tag and booking to determine whether flights on two different carriers involved "successive carrier" under article 1(3) or actual carrier under article 39). In addition, article three, which addresses documentation relating to the carriage of passengers and baggage, identifies only objective documentation to indicate the place of destination and the place of departure. Montreal Convention, Art. 3. The article thus relies on a "document of carriage" or substitute information with "a written statement" of information containing an indication of the "places of departure and destination." Montreal Convention, Art. 3. Article three therefore shows an intent of the parties to prefer objective evidence as markers to ascertain the duties of the parties.

The plain language of article 1(2) defines "international carriage" as carriage which, "according to the agreement between the parties, the place of departure and the place of destination" are situated "within the territory of a single State Party," such as the United States, "if there is an agreed stopping place within the territory of another State," such as Mexico. Montreal Convention, Art. 1(2). Carriage within "a single State Party," such as the United States, "without such an agreed stopping place . . . is not international carriage." Convention, Art. 1(2). Thus, if under the "agreement between the parties" the place of destination is Logan (or Puerto Vallarta which would implicate the language in article 1(2), to wit, "territories of two States Parties"), then the Convention applies. Convention, Art. 1(2). If, however, under the "agreement between the parties" the place of destination is Los Angeles, then the Convention does not apply. Convention, Art. 1(2).

Objective indicators of the parties' agreement include the PNR, the length of the layover, the itinerary, the electronic tickets, the boarding passes and the baggage tag for the return flights. These indicators establish the trip as international carriage. Notably, the tickets for the outbound flights from Boston to Los Angeles to Puerto Vallarta and the corresponding return flights were booked at the same time through the same ticketing agency. *Cf. Kruger v. United Air Lines, Inc.,* 2007 WL 3232443, *4 (N.D.Cal. Nov. 1, 2007) (trip did not constitute "international carriage" in part because the plaintiff "purchased Los Angeles to Brisbane flights from Quantas via its website and then separately purchased the Los Angeles to Seattle flights from United via United's website").

Plaintiff used her passport during the check-in process thereby evidencing international travel. Baggage checked at the departure city of Boston for the outbound portion did not end in Los Angeles but continued to Puerto Vallarta. The baggage tag for the return flights referenced both flight 239 and flight 1920. (Docket Entry # 14, Ex. 5).

The hours between the outbound arrival in Los Angeles and the departure to Puerto Vallarta were few in number thereby indicating a layover connection. " 'Common sense dictates that when a traveler plans such a short layover between the parts of a journey, the traveler regards the layover as merely an intermediate stopping place and not his or her destination.' " *In re Air Crash Disaster of Aviateca Flight 901 Near San Salvador, El Salvador on August 9, 1995,* 29 F.Supp.2d 1333,

1342 (S.D.Fla.1997) ("*Aviateca*"); *accord Robertson v. American Airlines, Inc.*, 401 F.3d 499, 502–503 (D.C.Cir.2005) (quoting *Aviateca* in parenthetical and finding that brief three hour layover supports finding that parties regarded trip as undivided international transportation).[15] Similarly, the PNR reflects that the time spent in Los Angeles to change carriers and planes on the return was slightly more than three hours. (Docket Entry # 14, Ex. 4). Plaintiff had no business in Los Angeles. (Docket Entry # 17, Ex. 3).

Accordingly, under "the agreement between the parties," Boston was the place of departure; Puerto Vallarta was an agreed stopping place in the territory of another state; and Boston was the place of destination. The carriage was therefore "international carriage" within the meaning of the Montreal Convention and the Convention therefore applies.

■ Plaintiff next argues that American Airlines waived its right to raise the statute of limitations defense because it did not, as required by article three, provide plaintiff with notice that the Convention applied. In pertinent part, article three reads as follows:

> 4. The passenger shall be given written notice to the effect that where this Convention is applicable it governs and may limit the liability of carriers in respect of death or injury and for destruction or loss of, or damage to, baggage, and for delay.

Montreal Convention, Art. 3(4).

The failure to comply with the documentation and informational requirements of article three, however, does not provide a means to avoid the reach and application of the Convention. Article 3(5) unambiguously states that:

> 5. Non-compliance with the provisions of the foregoing paragraphs shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

Montreal Convention, Art. 3(5). "[T]he effect of Article 3(5) is to ensure that passengers and carriers remain bound by the Montreal Convention despite a carrier's technical failure to provide a passenger with proper documentation." *Molefe v. KLM Royal Dutch Airlines*, 602 F.Supp.2d at 489 (albeit interpreting effect of non-compliance with article 3(1) as opposed to article 3(4)). The reasoning and result in *Molefe* apply to the failure on the part of American Airlines to give plaintiff the "written notice" required under article 3(4). As stated in article 3(5), "the rules of the [Montreal] Convention" apply to the parties' "contract of carriage" notwithstanding the non-compliance with the written notice requirement of article 3(4).

Finally, plaintiff argues that article 20 of the Montreal Convention, which together with article 21 adds a comparative negligence defense, *Olympic Airways v. Husain*, 540 U.S. 644, 649 n. 5, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004) ("Article 21 enables an air carrier to avoid or reduce its liability if it can prove the passenger's comparative negligence"), undermines the "presumption of strict liability" in article 17 of the Warsaw Convention versus article 17 in the Montreal Convention. The existence of liability, however, presents a different and secondary issue vis-à-vis the application of the treaty in the first in-

---

**15.** The fact that *Aviateca* and *Robertson* involved interpretations of the Warsaw Convention does not detract from this practical construction of the Montreal Convention with respect to the length of a short layover as evidencing a connecting flight within an international journey.

stance. The liability issue does not even arise in this case because the Convention applies and the two year limitations period in article 35 therefore bars the action.

The Montreal Convention has a two year statute of limitations. Montreal Convention, Art. 35. The two year period begins to run "from the date of arrival at the destination .. or from the date on which the carriage stopped." Montreal Convention, Art. 35. Plaintiff's suit is therefore time barred.

## CONCLUSION

In accordance with the foregoing discussion, the summary judgment motion (Docket Entry # 4) is **ALLOWED**. A final judgment shall issue in accordance with this opinion.